# FEDERAL TRADE COMMISSION *v.* PROCTER & GAMBLE CO.

No. 342.  Argued February 13, 1967.—Decided April 11, 1967.

*Solicitor General Marshall* argued the cause for petitioner. With him on the briefs were *Assistant Attorney General Turner, Richard A. Posner* and *James McI. Henderson.*

*Frederick W. R. Pride* and *Kenneth C. Royall* argued the cause for respondent. With them on the brief was *Robert D. Larsen.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This is a proceeding initiated by the Federal Trade Commission charging that respondent, Procter & Gamble Co., had acquired the assets of Clorox Chemical Co. in violation of § 7 of the Clayton Act, 38 Stat. 731, as amended by the Celler-Kefauver Act, 64 Stat. 1125,

15 U. S. C. § 18.[1]  The charge was that Procter's acquisition of Clorox might substantially lessen competition or tend to create a monopoly in the production and sale of household liquid bleaches.

Following evidentiary hearings, the hearing examiner rendered his decision in which he concluded that the acquisition was unlawful and ordered divestiture. On appeal, the Commission reversed, holding that the record as then constituted was inadequate, and remanded to the examiner for additional evidentiary hearings.  58 F. T. C. 1203.  After the additional hearings, the examiner again held the acquisition unlawful and ordered divestiture. The Commission affirmed the examiner and ordered divestiture.  63 F. T. C. —.  The Court of Appeals for the Sixth Circuit reversed and directed that the Commission's complaint be dismissed.  358 F. 2d 74.  We find that the Commission's findings were amply supported by the evidence, and that the Court of Appeals erred.

As indicated by the Commission in its painstaking and illuminating report, it does not particularly aid analysis to talk of this merger in conventional terms, namely, horizontal or vertical or conglomerate.  This merger may most appropriately be described as a "product-extension merger," as the Commission stated.  The facts are not disputed, and a summary will demonstrate the correctness of the Commission's decision.

At the time of the merger, in 1957, Clorox was the leading manufacturer in the heavily concentrated house-

---

[1] "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

hold liquid bleach industry. It is agreed that household liquid bleach is the relevant line of commerce. The product is used in the home as a germicide and disinfectant, and, more importantly, as a whitening agent in washing clothes and fabrics. It is a distinctive product with no close substitutes. Liquid bleach is a low-price, high-turnover consumer product sold mainly through grocery stores and supermarkets. The relevant geographical market is the Nation and a series of regional markets. Because of high shipping costs and low sales price, it is not feasible to ship the product more than 300 miles from its point of manufacture. Most manufacturers are limited to competition within a single region since they have but one plant. Clorox is the only firm selling nationally; it has 13 plants distributed throughout the Nation. Purex, Clorox's closest competitor in size, does not distribute its bleach in the northeast or mid-Atlantic States; in 1957, Purex's bleach was available in less than 50% of the national market.

At the time of the acquisition, Clorox was the leading manufacturer of household liquid bleach, with 48.8% of the national sales—annual sales of slightly less than $40,000,000. Its market share had been steadily increasing for the five years prior to the merger. Its nearest rival was Purex, which manufactures a number of products other than household liquid bleaches, including abrasive cleaners, toilet soap, and detergents. Purex accounted for 15.7% of the household liquid bleach market. The industry is highly concentrated; in 1957, Clorox and Purex accounted for almost 65% of the Nation's household liquid bleach sales, and, together with four other firms, for almost 80%. The remaining 20% was divided among over 200 small producers. Clorox had total assets of $12,000,000; only eight producers had assets in excess of $1,000,000 and very few had assets of more than $75,000.

In light of the territorial limitations on distribution, national figures do not give an accurate picture of Clorox's dominance in the various regions. Thus, Clorox's seven principal competitors did no business in New England, the mid-Atlantic States, or metropolitan New York. Clorox's share of the sales in those areas was 56%, 72%, and 64% respectively. Even in regions where its principal competitors were active, Clorox maintained a dominant position. Except in metropolitan Chicago and the west-central States Clorox accounted for at least 39%, and often a much higher percentage, of liquid bleach sales.

Since all liquid bleach is chemically identical, advertising and sales promotion are vital. In 1957 Clorox spent almost $3,700,000 on advertising, imprinting the value of its bleach in the mind of the consumer. In addition, it spent $1,700,000 for other promotional activities. The Commission found that these heavy expenditures went far to explain why Clorox maintained so high a market share despite the fact that its brand, though chemically indistinguishable from rival brands, retailed for a price equal to or, in many instances, higher than its competitors.

Procter is a large, diversified manufacturer of low-price, high-turnover household products sold through grocery, drug, and department stores. Prior to its acquisition of Clorox, it did not produce household liquid bleach. Its 1957 sales were in excess of $1,100,000,000 from which it realized profits of more than $67,000,000; its assets were over $500,000,000. Procter has been marked by rapid growth and diversification. It has successfully developed and introduced a number of new products. Its primary activity is in the general area of soaps, detergents, and cleansers; in 1957, of total domestic sales, more than one-half (over $500,000,000) were in this field. Procter was the dominant factor in this area.

It accounted for 54.4% of all packaged detergent sales. The industry is heavily concentrated—Procter and its nearest competitors, Colgate-Palmolive and Lever Brothers, account for 80% of the market.

In the marketing of soaps, detergents, and cleansers, as in the marketing of household liquid bleach, advertising and sales promotion are vital. In 1957, Procter was the Nation's largest advertiser, spending more than $80,000,000 on advertising and an additional $47,000,000 on sales promotion. Due to its tremendous volume, Procter receives substantial discounts from the media. As a multiproduct producer Procter enjoys substantial advantages in advertising and sales promotion. Thus, it can and does feature several products in its promotions, reducing the printing, mailing, and other costs for each product. It also purchases network programs on behalf of several products, enabling it to give each product network exposure at a fraction of the cost per product that a firm with only one product to advertise would incur.

Prior to the acquisition, Procter was in the course of diversifying into product lines related to its basic detergent-soap-cleanser business. Liquid bleach was a distinct possibility since packaged detergents—Procter's primary product line—and liquid bleach are used complementarily in washing clothes and fabrics, and in general household cleaning. As noted by the Commission:

> "Packaged detergents—Procter's most important product category—and household liquid bleach are used complementarily, not only in the washing of clothes and fabrics, but also in general household cleaning, since liquid bleach is a germicide and disinfectant as well as a whitener. From the consumer's viewpoint, then, packaged detergents and liquid bleach are closely related products. But the area of relatedness between products of Procter and of Clorox is wider. Household cleansing agents in

general, like household liquid bleach, are low-cost, high-turnover household consumer goods marketed chiefly through grocery stores and pre-sold to the consumer by the manufacturer through mass advertising and sales promotions. Since products of both parties to the merger are sold to the same customers, at the same stores, and by the same merchandising methods, the possibility arises of significant integration at both the marketing and distribution levels." 63 F. T. C. ——, ——.

The decision to acquire Clorox was the result of a study conducted by Procter's promotion department designed to determine the advisability of entering the liquid bleach industry. The initial report noted the ascendancy of liquid bleach in the large and expanding household bleach market, and recommended that Procter purchase Clorox rather than enter independently. Since a large investment would be needed to obtain a satisfactory market share, acquisition of the industry's leading firm was attractive. "Taking over the Clorox business . . . could be a way of achieving a dominant position in the liquid bleach market quickly, which would pay out reasonably well." 63 F. T. C., at ——. The initial report predicted that Procter's "sales, distribution and manufacturing setup" could increase Clorox's share of the markets in areas where it was low. The final report confirmed the conclusions of the initial report and emphasized that Procter could make more effective use of Clorox's advertising budget and that the merger would facilitate advertising economies. A few months later, Procter acquired the assets of Clorox in the name of a wholly owned subsidiary, the Clorox Company, in exchange for Procter stock.

The Commission found that the acquisition might substantially lessen competition. The findings and reasoning

of the Commission need be only briefly summarized. The Commission found that the substitution of Procter with its huge assets and advertising advantages for the already dominant Clorox would dissuade new entrants and discourage active competition from the firms already in the industry due to fear of retaliation by Procter. The Commission thought it relevant that retailers might be induced to give Clorox preferred shelf space since it would be manufactured by Procter, which also produced a number of other products marketed by the retailers. There was also the danger that Procter might underprice Clorox in order to drive out competition, and subsidize the underpricing with revenue from other products. The Commission carefully reviewed the effect of the acquisition on the structure of the industry, noting that "[t]he practical tendency of the . . . merger . . . is to transform the liquid bleach industry into an arena of big business competition only, with the few small firms that have not disappeared through merger eventually falling by the wayside, unable to compete with their giant rivals." 63 F. T. C., at —. Further, the merger would seriously diminish potential competition by eliminating Procter as a potential entrant into the industry. Prior to the merger, the Commission found, Procter was the most likely prospective entrant, and absent the merger would have remained on the periphery, restraining Clorox from exercising its market power. If Procter had actually entered, Clorox's dominant position would have been eroded and the concentration of the industry reduced. The Commission stated that it had not placed reliance on post-acquisition evidence in holding the merger unlawful.

The Court of Appeals said that the Commission's finding of illegality had been based on "treacherous conjecture," mere possibility and suspicion. 358 F. 2d 74, 83. It dismissed the fact that Clorox controlled almost

50% of the industry, that two firms controlled 65%, and that six firms controlled 80% with the observation that "[t]he fact that in addition to the six . . . producers sharing eighty per cent of the market, there were two hundred smaller producers . . . would not seem to indicate anything unhealthy about the market conditions." *Id.,* at 80. It dismissed the finding that Procter, with its huge resources and prowess, would have more leverage than Clorox with the statement that it was Clorox which had the "knowhow" in the industry, and that Clorox's finances were adequate for its purposes. *Ibid.* As for the possibility that Procter would use its tremendous advertising budget and volume discounts to push Clorox, the court found "it difficult to base a finding of illegality on discounts in advertising." 358 F. 2d, at 81. It rejected the Commission's finding that the merger eliminated the potential competition of Procter because "[t]here was no reasonable probability that Procter would have entered the household liquid bleach market but for the merger." 358 F. 2d, at 83. "There was no evidence tending to prove that Procter ever intended to enter this field on its own." 358 F. 2d, at 82. Finally, "[t]here was no evidence that Procter at any time in the past engaged in predatory practices, or that it intended to do so in the future." *Ibid.*

The Court of Appeals also heavily relied on post-acquisition "evidence . . . to the effect that the other producers subsequent to the merger were selling more bleach for more money than ever before" (358 F. 2d, at 80), and that "[t]here [had] been no significant change in Clorox's market share in the four years subsequent to the merger" (*ibid.*), and concluded that "[t]his evidence certainly does not prove anti-competitive effects of the merger." *Id.,* at 82. The Court of Appeals, in our view, misapprehended the standards for its review and the standards applicable in a § 7 proceeding.

Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of market power in their incipiency. The core question is whether a merger may substantially lessen competition, and necessarily requires a prediction of the merger's impact on competition, present and future. See *Brown Shoe Co. v. United States,* 370 U. S. 294; *United States v. Philadelphia National Bank,* 374 U. S. 321. The section can deal only with probabilities, not with certainties. *Brown Shoe Co. v. United States, supra,* at 323; *United States v. Penn-Olin Chemical Co.,* 378 U. S. 158. And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated.

All mergers are within the reach of § 7, and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate [2] or other. As noted by the Commission, this merger is neither horizontal, vertical, nor conglomerate. Since the products of the acquired company are complementary to those of the acquiring company and may be produced with similar facilities, marketed through the same channels and in the same manner, and advertised by the same media, the Commission aptly called this acquisition a "product-extension merger":

> "By this acquisition . . . Procter has not diversified its interests in the sense of expanding into a substantially different, unfamiliar market or industry. Rather, it has entered a market which adjoins, as it were, those markets in which it is already established, and which is virtually indistinguishable from

---

[2] A pure conglomerate merger is one in which there are no economic relationships between the acquiring and the acquired firm.

them insofar as the problems and techniques of marketing the product to the ultimate consumer are concerned. As a high official of Procter put it, commenting on the acquisition of Clorox, 'While this is a completely new business for us, taking us for the first time into the marketing of a household bleach and disinfectant, we are thoroughly at home in the field of manufacturing and marketing low priced, rapid turn-over consumer products.' " 63 F. T. C. ——, ——.

The anticompetitive effects with which this product-extension merger is fraught can easily be seen: (1) the substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing; (2) the acquisition eliminates the potential competition of the acquiring firm.

The liquid bleach industry was already oligopolistic before the acquisition, and price competition was certainly not as vigorous as it would have been if the industry were competitive. Clorox enjoyed a dominant position nationally, and its position approached monopoly proportions in certain areas. The existence of some 200 fringe firms certainly does not belie that fact. Nor does the fact, relied upon by the court below, that, after the merger, producers other than Clorox "were selling more bleach for more money than ever before." 358 F. 2d, at 80. In the same period, Clorox increased its share from 48.8% to 52%. The interjection of Procter into the market considerably changed the situation. There is every reason to assume that the smaller firms would become more cautious in competing due to their fear of retaliation by Procter. It is probable that Procter would become the price leader and that oligopoly would become more rigid.

The acquisition may also have the tendency of raising the barriers to new entry. The major competitive weapon in the successful marketing of bleach is advertising. Clorox was limited in this area by its relatively small budget and its inability to obtain substantial discounts. By contrast, Procter's budget was much larger; and, although it would not devote its entire budget to advertising Clorox, it could divert a large portion to meet the short-term threat of a new entrant. Procter would be able to use its volume discounts to advantage in advertising Clorox. Thus, a new entrant would be much more reluctant to face the giant Procter than it would have been to face the smaller Clorox.[3]

---

[3] The barriers to entry have been raised both for entry by new firms and for entry into new geographical markets by established firms. The latter aspect is demonstrated by Purex's lesson in Erie, Pennsylvania. In October 1957, Purex selected Erie, Pennsylvania— where it had not sold previously—as an area in which to test the salability, under competitive conditions, of a new bleach. The leading brands in Erie were Clorox, with 52%, and the "101" brand, sold by Gardner Manufacturing Company, with 29% of the market. Purex launched an advertising and promotional campaign to obtain a broad distribution in a short time, and in five months captured 33% of the Erie market. Clorox's share dropped to 35% and 101's to 17%. Clorox responded by offering its bleach at reduced prices, and then added an offer of a $1-value ironing board cover for 50¢ with each purchase of Clorox at the reduced price. It also increased its advertising with television spots. The result was to restore Clorox's lost market share and, indeed, to increase it slightly. Purex's share fell to 7%.

Since the merger Purex has acquired the fourth largest producer of bleach, John Puhl Products Company, which owned and marketed "Fleecy White" brand in geographic markets which Purex was anxious to enter. One of the reasons for this acquisition, according to Purex's president, was that:

"Purex had been unsuccessful in expanding its market position geographically on Purex liquid bleach. The economics of the bleach business, and the strong competitive factors as illustrated by our experience in Erie, Pennsylvania, make it impossible, in our judgment, for us to expand our market on liquid bleach."

Possible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition. See *Brown Shoe Co.* v. *United States, supra,* at 344.

The Commission also found that the acquisition of Clorox by Procter eliminated Procter as a potential competitor. The Court of Appeals declared that this finding was not supported by evidence because there was no evidence that Procter's management had ever intended to enter the industry independently and that Procter had never attempted to enter. The evidence, however, clearly shows that Procter was the most likely entrant. Procter had recently launched a new abrasive cleaner in an industry similar to the liquid bleach industry, and had wrested leadership from a brand that had enjoyed even a larger market share than had Clorox. Procter was engaged in a vigorous program of diversifying into product lines closely related to its basic products. Liquid bleach was a natural avenue of diversification since it is complementary to Procter's products, is sold to the same customers through the same channels, and is advertised and merchandised in the same manner. Procter had substantial advantages in advertising and sales promotion, which, as we have seen, are vital to the success of liquid bleach. No manufacturer had a patent on the product or its manufacture, necessary information relating to manufacturing methods and processes was readily available, there was no shortage of raw material, and the machinery and equipment required for a plant of efficient capacity were available at reasonable cost. Procter's management was experienced in producing and marketing goods similar to liquid bleach. Procter had considered the possibility of independently entering but decided against it because the acquisition of Clorox would en-

able Procter to capture a more commanding share of the market.

It is clear that the existence of Procter at the edge of the industry exerted considerable influence on the market. First, the market behavior of the liquid bleach industry was influenced by each firm's predictions of the market behavior of its competitors, actual and potential. Second, the barriers to entry by a firm of Procter's size and with its advantages were not significant. There is no indication that the barriers were so high that the price Procter would have to charge would be above the price that would maximize the profits of the existing firms. Third, the number of potential entrants was not so large that the elimination of one would be insignificant. Few firms would have the temerity to challenge a firm as solidly entrenched as Clorox. Fourth, Procter was found by the Commission to be the most likely entrant. These findings of the Commission were amply supported by the evidence.

The judgment of the Court of Appeals is reversed and remanded with instructions to affirm and enforce the Commission's order.

*It is so ordered.*

MR. JUSTICE STEWART and MR. JUSTICE FORTAS took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, concurring.

I agree that the Commission's order should be sustained, but I do not share the majority opinion's view that a mere "summary will demonstrate the correctness of the Commission's decision" nor that "[t]he anticompetitive effects with which this product-extension merger is fraught can easily be seen." I consider the case difficult within its own four corners, and beyond that, its portents

for future administrative and judicial application of § 7 of the Clayton Act to this kind of merger important and far-reaching. From both standpoints more refined analysis is required before putting the stamp of approval on what the Commission has done in this case. It is regrettable to see this Court as it enters this comparatively new field of economic adjudication starting off with what has almost become a kind of *res ipsa loquitur* approach to antitrust cases.

The type of merger represented by the transaction before us is becoming increasingly important as large corporations seek to diversify their operations, see Blair, The Conglomerate Merger in Economics and Law, 46 Geo. L. J. 672, and "[c]ompanies looking for new lines of business tend to buy into those fields with which they have at least some degree of familiarity, and where economies and efficiencies from assimilation are at least possible." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv. L. Rev. 1313, 1315. Application of § 7 to such mergers has been troubling to the Commission and the lower courts. The author of the Commission's exhaustive opinion in this case later explained that "[t]he elaborateness of the opinion . . . reflected the Commission's awareness that it was entering relatively uncharted territory." *General Foods Corp.,* 3 Trade Reg. Rep. ¶ 17,465 (Commissioner Elman, dissenting, at 22,745). The Sixth Circuit was equally troubled in this case by the lack of standards in the area and had difficulty in perceiving any effect on competition from the merger since "Procter merely stepped into the shoes of Clorox." 358 F. 2d 74, 82. And in the somewhat similar situation presented to the Seventh Circuit in *Ekco Products Co.* v. *F. T. C.,* 347 F. 2d 745, the need for comprehensive consideration of the problem by this Court was laid bare. The lower court there attempted to review the Commission action before it as

narrowly as possible and refused to formulate principles which might control other cases. It said:

> "If we are to have a different standard or set of rules, aside from those applying to vertical and horizontal combinations, to test the illegality of conglomerate mergers and product-extension acquisitions in cases brought under Section 7 of the Clayton Act, we feel compelled to look to the Supreme Court for guidance." 347 F. 2d, at 751.

I thus believe that it is incumbent upon us to make a careful study of the facts and opinions below in this case, and at least to embark upon the formulation of standards for the application of § 7 to mergers which are neither horizontal nor vertical and which previously have not been considered in depth by this Court.[1] I consider this especially important in light of the divisions which have arisen in the Commission itself in similar cases decided subsequent to this one. See *General Foods Corp.*, *supra; National Tea Co.*, 3 Trade Reg. Rep. ¶ 17,463. My prime difficulty with the Court's opinion is that it makes no effort in this direction at all, and leaves the Commission, lawyers, and businessmen at large as to what is to be expected of them in future cases of this kind.

## I.

The Court's opinion rests on three separate findings of anticompetitive effect. The Court first declares that the market here was "oligopolistic" and that interjection of

---

[1] It has been argued that the mergers before this Court in *United States* v. *Aluminum Co. of America*, 377 U. S. 271, and *United States* v. *Continental Can Co.*, 378 U. S. 441, were essentially conglomerate. But the majority in both cases chose to treat them as horizontal and thus did not reach the problem of standards for judging conglomerate mergers. See Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan. L. Rev. 285, 303–308.

Procter would make the oligopoly "more rigid" because "[t]here is every reason to assume that the smaller firms would become more cautious in competing due to their fear of retaliation by Procter." The Court, however, does not indicate exactly what reasons lie behind this assumption, or by what standard such an effect is deemed "reasonably probable." It could equally be assumed that smaller firms would become more aggressive in competing due to their fear that otherwise Procter might ultimately absorb their markets and that Procter, as a new entrant in the bleach field, was vulnerable to attack.

But assumption is no substitute for reasonable probability as a measure of illegality under § 7, see *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 323, and Congress has not mandated the Commission or the courts "to campaign against 'superconcentration' in the absence of any evidence of harm to competition." Turner, *supra,* at 1395. Moreover, even if an effect of this kind were reasonably predictable, the Court does not explain why the effect on competition should be expected to be the substantial one that § 7 demands. The need for substantiality cannot be ignored, for as a leading economist has warned:

> "If a society were to intervene in every activity which might possibly lead to a reduction of competition, regulation would be ubiquitous and the whole purpose of a public policy of competition would be frustrated." Stigler, Mergers and Preventive Antitrust Policy, 104 U. Pa. L. Rev. 176, 177.

The Court next stresses the increase in barriers to new entry into the liquid bleach field caused primarily, it is thought, by the substitution of the larger advertising capabilities of Procter for those of Clorox. Economic theory would certainly indicate that a heightening of such

barriers has taken place. But the Court does not explain why it considers this change to have significance under § 7, nor does it indicate when or how entry barriers affect competition in a relevant market. In this case, for example, the difficulties of introducing a new nationally advertised bleach were already so great that even a great company like Procter, which the Court finds the most likely entrant, believed that entry would not "pay out." [2] Why then does the Court find that a further increase of incalculable proportions in such barriers substantially lessens competition? Such a conclusion at least needs the support of reasoned analysis.[3]

Finally, the Court places much emphasis on the loss to the market of the most likely potential entrant, Procter. Two entirely separate anticompetitive effects might be traced to this loss, and the Court fails to distinguish between them. The first is simply that loss of the most likely entrant increases the operative barriers to entry by decreasing the likelihood that any firm will attempt to

---

[2] Thus the Procter memorandum which considered the question of entry into the liquid bleach market stated: "We would not recommend that the Company consider trying to enter this market by introducing a new brand or by trying to expand a sectional brand. This is because we feel it would require a very heavy investment to achieve a major volume in the field, and with the low 'available,' [a reference to profit margin] the payout period would be very unattractive."

[3] The need for analysis is even clearer in light of the fact that entry into the market by producers of nonadvertised, locally distributed bleaches was found to be easy. There were no technological barriers to entry, and the capital requirements for entry, with the exception of advertising costs, were small. The Court must at least explain why the threat of such entry and the presence of small competitors in existing regional markets cannot be considered the predominant, and unaffected, form of competition. To establish its point, the Court must either minimize the importance of such competition or show why it would be substantially lessened by the merger.

surmount them.[4]  But this effect merely reinforces the Court's previous entry-barrier argument, which I do not find convincing as presented.  The second possible effect is that a reasonably probable entrant has been excluded from the market and a measure of horizontal competition has been lost.  Certainly the exclusion of what would promise to be an important independent competitor from the market may be sufficient, in itself, to support a finding of illegality under § 7, *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651, when the market has few competitors.  The Commission, however, expressly refused to find a reasonable probability that Procter would have entered this market on its own, and the Sixth Circuit was in emphatic agreement.  The Court certainly cannot mean to set its judgment on the facts against the concurrent findings below, and thus it seems clear to me that no consequence can be attached to the possibility of loss of Procter as an actual competitor.[5] Cf. *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158, 175.

Thus I believe, with all respect, that the Court has failed to make a convincing analysis of the difficult problem presented, and were no more to be said in favor of the Commission's order I would vote to set it aside.

## II.

The Court, following the Commission, points out that this merger is not a pure "conglomerate" merger but may more aptly be labelled a "product-extension" merger.

---

[4] Bain's pioneering study of barriers to entry, Barriers to New Competition, recognized that such barriers could be surmounted at different price levels by different potential entrants.  Thus even without change in the nature of the barriers themselves, the market could become more insulated through loss of the most likely entrant simply because the prevailing market price would have to rise to a higher level than before to induce entry.

[5] For a discussion of the difficulty of determining whether entry by a particular company is probable see Brodley, *supra,* n. 1, at 332.

No explanation, however, is offered as to why this distinction has any significance and the Court in fact declares that all mergers, whatever their nature, "must be tested by the same standard." But no matter what label is attached to this transaction, it certainly must be recognized that the problem we face is vastly different from those which concerned the Court in *Brown Shoe, supra,* and *United States* v. *Philadelphia National Bank,* 374 U. S. 321. And though it is entirely proper to assert that the words of § 7 are the only standard we have with which to work, it is equally important to recognize that different sets of circumstances may call for fundamentally different tests of substantial anticompetitive effect. Compare *United States* v. *Philadelphia National Bank, supra,* with *FTC* v. *Consolidated Foods Corp.,* 380 U. S. 592.

At the outset, it seems to me that there is a serious question whether the state of our economic knowledge is sufficiently advanced to enable a sure-footed administrative or judicial determination to be made *a priori* of substantial anticompetitive effect in mergers of this kind. It is clear enough that Congress desired that conglomerate and product-extension mergers be brought under § 7 scrutiny, but well versed economists have argued that such scrutiny can never lead to a valid finding of illegality.

> "Where a business concern buys out a firm producing . . . [a product] which is neither competing, nor a raw material for its own product . . . there is no competition between them to be extinguished, nor the possibility of fewer alternatives for any customer or supplier anywhere. . . . Perhaps Congress intended to stop conglomerate mergers but their act does not." Adelman, quoted in Blair, *supra,* at 674.

See also Bowman, Contrasts in Antitrust Theory: II, 65 Col. L. Rev. 417, 421.

Lending strength to this position is the fact that such mergers do provide significant economic benefits which argue against excessive controls being imposed on them. The ability to merge brings large firms into the market for capital assets and encourages economic development by holding out the incentive of easy and profitable liquidation to others. Here, for example, the owners of Clorox who had built the business, were able to liquefy their capital on profitable terms without dismantling the enterprise they had created. Also merger allows an active management to move rapidly into new markets bringing with its intervention competitive stimulation and innovation. It permits a large corporation to protect its shareholders from business fluctuation through diversification, and may facilitate the introduction of capital resources, allowing significant economies of scale, into a stagnating market. See Turner, *supra,* at 1317.

At the other end of the spectrum, it has been argued that the entry of a large conglomerate enterprise may have a destructive effect on competition in any market. Edwards, Conglomerate Bigness as a Source of Power, in Business Concentration and Price Policy, Report of National Bureau of Economic Research, p. 331. The big company is said to be able to "outbid, outspend, or outlose the small one . . . ." *Id.,* at 335. Thus it is contended that a large conglomerate may underprice in one market, adversely affecting competition, and subsidize the operation by benefits accruing elsewhere.[6] It is also argued that the large company generates psychological pressure which may force smaller ones to follow its pricing policies, and that its very presence in the

---

[6] But see Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv. L. Rev. 1313, 1340. "[T]he belief that predatory pricing is a likely consequence of conglomerate size, and hence of conglomerate merger, is wholly unverified by any careful studies . . . ."

market may discourage entrants or make lending institutions unwilling to finance them. Edwards, *supra,* at 348; see Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 275.[7] While "business behavior is too complex and varied to permit of a single generalized explanation," Stocking, Comment, Business Concentration and Price Policy, *supra,* at 352, these observations do indicate that significant dangers to competition *may* be presented by some conglomerate and product-extension mergers. Further, congressional concern in enacting § 7 extended not only to anticompetitive behavior in particular markets, but also to the possible economic dominance of large companies which had grown through merger. Thus, while fully agreeing that mergers of this kind are not to be regarded as something entirely set apart from scrutiny under § 7, I am of the view that when this Court does undertake to establish the standards for judging their legality, it should proceed with utmost circumspection. Meanwhile, with this case before us, I cannot escape the necessity of venturing my own views as to some of the governing standards.

## III.

In adjudicating horizontal and vertical combinations under § 7 where the effects on competition are reasonably obvious and substantiality is the key issue, the respon-

---

[7] But see Cook, Merger Law and Big Business: A Look Ahead, 40 N. Y. U. L. Rev. 710, 713. "Of course, the conglomerate cases are the best examples of the exotic restraints. Here mere speculation on what either common sense or judiciously selected economists might lead one to infer is apparently enough to prevent a merger. One reads these opinions with growing incredulity. They imply that big businesses have so much strength and such deep pockets that they simply could not lose out in competition with smaller companies . . . . One does not need a statistical survey to know that this is simply not the way the world is."

sible agencies have moved away from an initial emphasis. on comprehensive scrutiny and opted for more precise rules of thumb which provide advantages of administrative convenience and predictability for the business world. See Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan. L. Rev. 285.[8]  A conglomerate case, however, is not only too new to our experience to allow the formulation of simple rules but also involves "concepts of economic power and competitive effect that are still largely unformulated." This makes clear the need for "full investigation and analysis, whatever the cost in delay or immediate ineffectiveness." Edwards, Tests of Probable Effect Under the Clayton Act, 9 Antitrust Bull. 369, 377. But cf. Blair, *supra,* at 700. Certainly full scale investigation is supported by the considerations adverted to in Part II of this opinion and the basic fact that "the statute does not leave us free to strike down mergers on the basis of sheer speculation or a general fear of bigness." *General Foods Corp., supra,* at 22,749 (Commissioner Elman, dissenting).

Procter, contending that the broadest possible investigation is required here, and noting "the relative poverty of [economic] information about industrial institutions and the relations among different company complexes, as well as the sketchiness of our understanding of methods of competition in specific industries and markets,"

---

[8] In so doing the Court has moved away from the original recommendations in the Report of the Attorney General's National Committee to Study the Antitrust Laws, which concluded that "it will always be necessary to analyze the effect of the merger on relevant markets in sufficient detail, given the circumstances of each case, to permit a reasonable conclusion as to its probable economic effect." Report, at 123. But the development of specific criteria was aided by a degree of experience which does not exist in conglomerate cases, where the caution to analyze in detail seems particularly sound.

Bock, The Relativity of Economic Evidence in Merger Cases—Emerging Decisions Force the Issue, 63 Mich. L. Rev. 1355, 1369, has insisted throughout this proceeding that anticompetitive effects must be proved *in fact* from post-merger evidence in order for § 7 to be applied. The Court gives little attention to this contention, but I think it must be considered seriously, both because it is arguable and because it was, in a sense, the main source of difference between the Commission and the Sixth Circuit.

In its initial decision, the Commission remanded the proceeding to the Examiner for the express purpose of taking additional evidence on the post-merger situation in the liquid bleach industry. The Commission first held that the record before it, which contained all the information upon which the second Commission decision and the Court rely, was insufficient to support the finding of a § 7 violation. 58 F. T. C. 1203. The Commission's subsequent opinion, handed down by an almost entirely changed Commission, held post-merger evidence generally irrelevant and "proper only in the unusual case in which the structure of the market has changed radically since the merger . . . ." 63 F. T. C. ——, ——. Market structure changes, rather than evidence of market behavior, were held to be the key to a § 7 analysis.

In support of this position, the Commission noted that dependence on post-merger evidence would allow controls to be evaded by the dissimulation of market power during the period of observation. For example, Procter had been aware of the § 7 challenge almost from the date of the merger,[9] and it would be unrealistic, so reasoned the Commission, to assume that market power would be used adversely to competition during the pendency of the proceeding.

---

[9] The merger was consummated August 1, 1957. The Commission's complaint was filed on October 7, 1957.

The Commission also emphasized the difficulty of unscrambling a completed merger, and the need for businessmen to be able to make at least some predictions as to the legality of their actions when formulating future market plans. Cf. Bromley, Business' View of the du Pont-General Motors Decision, 46 Geo. L. J. 646, 653–654. Finally, the Commission pointed to the strain which would be placed upon its limited enforcement resources by a requirement to assemble large amounts of post-merger data.

The Sixth Circuit was in disagreement with the second Commission's view. It held that "[a]ny relevant evidence must be considered in a Section 7 case . . . . The extent to which inquiry may be made into post-merger conditions may well depend on the facts of the case, and where the evidence is obtained it should not be ignored." 358 F. 2d, at 83. The court characterized as "pure conjecture" the finding that Procter's behavior might have been influenced by the pendency of the proceeding. *Ibid.*

If § 7 is to serve the purposes Congress intended for it, we must, I think, stand with the Commission on this issue.[10] Only by focusing on market structure can we begin to formulate standards which will allow the responsible agencies to give proper consideration to such mergers and allow businessmen to plan their actions with a fair degree of certainty. In the recent amendments to the Bank Merger Act, Congress has indicated its approval of rapid adjudication based on premerger conditions,[11]

---

[10] Cf. *FTC* v. *Consolidated Foods Corp.*, 380 U. S. 592, where this Court held that even an extensive post-merger history, developed outside the influence of a § 7 challenge, was not to be considered a conclusive negation of the possibility of anticompetitive effects.

[11] The amendments to the Bank Merger Act (80 Stat. 7) require a merger to be challenged within 30 days of agency approval. This negates the possibility of substantial post-merger evidence. 12 U. S. C. § 1828 (c). It is noteworthy that Congress has required

and all agency decisions hinging on competitive effects must be made without benefit of post-combination results. The value of post-merger evidence seems more than offset by the difficulties encountered in obtaining it. And the post-merger evidence before us in this proceeding is at best inconclusive.

Deciding that § 7 inquiry in conglomerate or product-extension merger cases should be directed toward reasonably probable changes in market structure does not, however, determine how that inquiry should be narrowed and focused. The Commission and the Court isolate two separate structural elements, the degree of concentration in the existing market and the "condition of entry." The interplay of these two factors is said to determine the existence and extent of market power, since the "condition of entry" determines the limits potential competition places on the existing market. It must be noted, however, that economic theory teaches that potential competition will have no effect on the market behavior of existing firms unless present market power is sufficient to drive the market price to the point where entry would become a real possibility.[12] So long as existing competi-

---

rapid adjudication and at the same time required a determination more complex than that which must be made under the antitrust laws. In a Bank Merger Act case the defendants may seek to have the merger upheld because "the anticompetitive effects . . . are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served." 12 U. S. C. § 1828 (c)(5)(B) (1964 ed., Supp. II).

[12] Thus Bain points out that in a competitive market where market price is presumed to be cost-based the threat of entry should not affect market price because each firm is presumed to make its pricing decisions without considering their impact on the market as a whole. Even in an oligopolistic market in which each seller must assume that its price actions will have marketwide effect, the threat of entry serves to limit market price only when the optimum return would be obtained at a price sufficient to induce entry. So long as the optimum price is below the entry-triggering price, the threat of entry has no real impact on the market.

tion is sufficient to keep the market price below that point, potential competition is of marginal significance as a market regulator. Thus in a conglomerate or product-extension case, where the effects on market structure which are easiest to discover are generally effects on the "condition of entry," an understanding of the workings of the premerger market cannot be ignored, and, indeed, is critical to a determination whether the visible effects on "condition of entry" have any competitive significance.

The Commission pinned its analysis of the premerger market exclusively on its concentration, the large market share enjoyed by the leading firms. In so doing the Commission was following the path taken by this Court in judging more conventional merger cases, e. g., *United States v. Philadelphia National Bank, supra,* and taking the position favored by the great weight of economic authority. See, e. g., Bain, Industrial Organization. The Sixth Circuit discounted the Commission's analysis because of the presence of some 200 small competitors in the market. The Court bases its agreement with the Commission and its rejection of the Court of Appeals" position on Clorox's alleged domination of the market. But domination is an elusive term, for dominance in terms of percentage of sales is not the equivalent of dominance in terms of control over price or other aspects of market behavior. Just as the total number of sellers in the market is not determinative of its operation, the percentage of sales made by any group of sellers is similarly not conclusive. The determinative issue is, instead, how the sellers interact and establish the pattern of market behavior. The significance of concentration analysis is that it allows measurement of one easily determined variable to serve as an opening key to the pattern of market behavior.

I think that the Commission, on *this* record, was entitled to regard the market as "oligopolistic" and that it could properly ignore the impact of the smaller firms. I hasten to add, however, that there are significant "economic dissents" from oligopoly analysis in general and stronger arguments that if its principles "are justified in some cases, they are not justified in all cases . . . ." Brodley, *supra,* at 292. In adjudicating § 7 questions in a conglomerate or product-extension merger context where the pattern of behavior in the existing market is apt to be crucial, I would, therefore, allow the introduction by a defendant of evidence designed to show that the actual operation of the market did not accord with oligopoly theory, or whatever other theory the Commission desires to apply. In other words, I believe that defendants in § 7 proceedings are entitled, in the case of conglomerate or product-extension mergers, to build their own economic cases for the proposition that the mergers will not substantially impair competition.

For example, had Procter desired to go beyond demonstrating the mere presence of small competitors and attempted to show that the prices of unadvertised bleaches which were cost-determined set an effective ceiling on market price through the mechanism of an acceptable differential,[13] I think that the Commission

---

[13] There was evidence in the record that the liquid bleach market had three separate price levels, one for nationally advertised brands (Clorox and Purex), another for regional brands, and a third for local brands. There was also some testimony by officials of the companies producing the unadvertised regional and local brands, which sold at a lower price than Clorox and Purex, that their prices were determined by their costs. Some witnesses also testified that sales of unadvertised brands were extremely price elastic, and Bain's study of the related soap industry would lend support to that observation. Bain, Barriers to New Competition, Appendix D, at 283. Thus, an argument might have been made that because of this price consciousness the prices of advertised brands could not

would have been obliged to receive and evaluate the proof. But to challenge effectively the presumption which the Commission is entitled to draw from general economic theory, a defendant must present, in my opinion, not only contradictory facts but a more cogent explanation of the pattern of market behavior.

If the proof as a whole establishes that pricing power may be exercised by a firm or firms in the market—that prices may be raised in the long run over competitive prices—then the Commission may legitimately focus on the role of potential competition and the "condition of entry." See Bain, Barriers to New Competition 5, 27. In so doing, however, a new difficulty is encountered. The threat of potential competition merely affects the range over which price power extends. Potential competition does not compel more vigorous striving in the market, nor advance any other social goal which Congress might be said to have favored in passing § 7.[14] Thus it may legitimately be questioned whether even a substantial increase in entry barriers creates a substantial lessening of competition or tendency to monopoly as required by § 7.

Two justifications for the use of entry barriers as a determinant under § 7 can be given. The first is that an increased range over which pricing power may be exercised

---

greatly exceed those of regional and local brands, and therefore costs served as the ultimate determinant of market price. On the other hand, there is testimony in the record that the pricing policy of some unadvertised producers was to follow the price of Clorox and maintain a differential sufficient to provide adequate sales.

[14] Potential entry does not keep "a large number of small competitors in business," *United States* v. *Von's Grocery Co.*, 384 U. S. 270, 275, even if that goal could be considered desirable. In fact, by placing a ceiling on market price it may serve to drive out small competitors who may be relatively inefficient producers. Potential entry does not control the market share of dominant firms or prevent them from expanding their power to force others to accede to their practices.

is contrary to the mandate of § 7 because Congress' use of the word "competition" was a shorthand for the invocation of the benefits of a competitive market, one of which is a price close to average cost. Such an approach leads also to the conclusion that economic efficiencies produced by the merger must be weighed against anticompetitive consequences in the final determination whether the net effect on competition is substantially adverse. See Bork & Bowman, The Crisis in Antitrust, 65 Col. L. Rev. 363. The second justification is found in the tendency-to-monopoly clause of § 7. Certainly the clearest evil of monopoly is the excessive power the monopolist has over price. Since "antitrust operates to forestall concentrations of economic power which, if allowed to develop unhindered, would call for much more intrusive government supervision of the economy," Blake & Jones, In Defense of Antitrust, 65 Col. L. Rev. 377, 383, increased power over price should be attackable under § 7. Cf. S. Rep. No. 1775, 81st Cong., 2d Sess., 4–5. For these reasons I conclude that the Commission may properly find a conglomerate or product-extension merger illegal under § 7 because it substantially increases pricing power in the relevant market.

Given the development of a case against the merger in this area, however, the problem of efficiencies raised above must still be faced. The Court attempts to brush the question aside by asserting that Congress preferred competition to economies, but neglects to determine whether certain economies are inherent in the idea of competition. If it is conceded, as it must be, that Congress had reasons for favoring competition, then more efficient operation must have been among them. It is of course true that a firm's ability to achieve economies enhances its competitive position, but adverse effects on competitors must be distinguished from adverse effects on competition. *Brown Shoe Co.* v. *United States, supra*, at

320. Economies achieved by one firm may stimulate matching innovation by others, the very essence of competition. They always allow the total output to be delivered to the consumer with an expenditure of fewer resources. Thus when the case against a conglomerate or product-extension merger rests on a market-structure demonstration that the likelihood of anticompetitive consequences has been substantially increased, the responsible agency should then move on to examine and weigh possible efficiencies arising from the merger in order to determine whether, on balance, competition has been substantially lessened.[15] Where detriments to competition are apt to be "highly speculative" it seems wisest to conclude that "possibilities of adverse effects on competitive behavior are worth worrying about only when the merger does not involve substantial economies . . . ." Turner, *supra,* at 1354. The Court must proceed with caution in this area lest its decision "over the long run deter new market entry and tend to stifle the very competition it seeks to foster." *United States* v. *Von's Grocery Co.,* 384 U. S. 270, 301 (STEWART, J., dissenting).

To summarize then, four important guides to the adjudication of conglomerate or product-extension mergers under § 7 seem to come forward. First, the decision can rest on analysis of market structure without resort to evidence of post-merger anticompetitive behavior. Second, the operation of the premerger market must be understood as the foundation of successful analysis. The responsible agency may presume that the market operates in accord with generally accepted principles of economic theory, but the presumption must be open to the chal-

---

[15] I intimate no view on whether economies would be a defense in a situation such as that presented in *Ekco Products Co.* v. *F. T. C.,* 347 F. 2d 745, where the evidence established that the company entering the market by merger intended to eliminate all competition, and had, in fact, purchased a leading competitor after entry.

lenge of alternative operational formulations. Third, if it is reasonably probable that there will be a change in market structure which will allow the exercise of substantially greater market power, then a prima facie case has been made out under § 7. Fourth, where the case against the merger rests on the probability of increased market power, the merging companies may attempt to prove that there are countervailing economies reasonably probable which should be weighed against the adverse effects.

## IV.

The Commission's decision did, I think, conform to this analysis. A review of the points the Commission relied upon is next required.

The Commission first attempted a catalogue of all the possible effects of the merger on competition, many of which were "to an important degree psychological." 63 F. T. C., at ——. Most of these "effects" were speculations on the impact of Procter's ability to obtain advertising discounts and use its financial resources for increased sales promotion. Others were predictions as to the possible responses of retailers and competitors to Procter's entry and expected promotional activities. These were, as the Court of Appeals said, speculative at best but the Commission did not place great reliance on them in reaching its ultimate conclusion.

To hold the merger unlawful, the Commission relied on five factors which taken together convinced it that "substantial" anticompetitive consequences could be expected. A "substantial" impact was said to be "significant and real, and discernible not merely to theorists or scholars but to practical, hard-headed businessmen." 63 F. T. C., at ——. The relevant factors were (1) the excessive concentration in the industry at the time of the merger and the commanding market position of Clorox, (2) the relative disparity in size and strength

between Procter and the firms in the liquid bleach industry, (3) the position of Procter in other markets, (4) the elimination of Procter as a potential competitor, and (5) the nature of the "economies" expected from the merger. The net of these factors was to establish a substantial effect on the market structure variable involved, condition of entry.

Because Clorox had 48.8% of the premerger market and six firms made 80% of the sales, the Commission's conclusion that the market was oligopolistic and Clorox was the price leader must be sustained on this record where no alternative formulation of market operation was attempted. See *United States* v. *Philadelphia National Bank, supra;* Bain, Industrial Organization. The Commission's position is aided by actual evidence in the record supporting its hypothesis. Officials of other bleach companies appearing in the proceedings testified that their prices were established with regard to Clorox's price and uniformly regarded Clorox as the leading competitor in the market. The foundation was thus adequate for a consideration of probable changes in the "condition of entry."

Procter was indisputably many times the size of any firm in the liquid bleach industry and had great financial resources. Its advertising budget was more than 20 times that of Clorox and the scale of its expenditures qualified it for quantity discounts from media as well as enabling it to purchase expensive but advantageous advertising outlets. The record clearly showed that "preselling" through advertising was a requisite for large scale liquid bleach operations,[16] and thus the difference between Procter's advertising power and that of Clorox was important to a potential entrant. The expenditure on advertising which would have to be undertaken by a potential

---

[16] This conclusion is supported by Bain's study of the closely related soap and detergent markets. See n. 13, *supra.*

entrant in order to capture an acceptable market would vary with the tenacity of response to be expected from existing competitors. The greater the expenditure required, the higher the price to be commanded would have to be before entry would be undertaken.[17] In this regard the substitution of Procter for Clorox was a substantial change.

Procter's strong position in other product markets is equally relevant to the probability of change in the "condition of entry." It would be unrealistic, however, to attach substantial importance to Procter's extensive financial resources unless Procter were able to bring them to bear in the liquid bleach industry. If Procter were hard pressed along all fronts of its operation, competitors could safely assume that increased pressure in the liquid bleach industry would not provoke a strong response, simply because financial resources could not be diverted to that purpose. Procter, however, was conducting highly profitable operations in other markets and had demonstrated its ability to bring large resources to bear in intensive competitive campaigns by its successful introduction of Comet cleanser and various toothpastes on a nationwide scale. Proof of demonstrated ability to mobilize and utilize large financial resources seems to me required if the introduction of such resources into the market is alleged to have a substantial effect.[18] Such proof exists in this record.

[17] This is the "lesson" of the incident in Erie, Pennsylvania, where Clorox was able to repel Purex's assault on its market position. Purex's initial success showed that part of the market could be captured, but Procter's response made clear that the beachhead could not be maintained without continued heavy advertising expenses. Unless the price commanded was expected to be quite high, these advertising expenditures could not be sustained.

[18] This limitation was recognized by the author of the Commission's opinion in this case, Commissioner Elman, in his dissenting

Procter's role as a potential entrant was also related, by the Commission, to the "condition of entry." The Commission had "no occasion to speculate on such questions as whether or not Procter . . . would in fact have entered the bleach industry on its own . . . ." 63 F. T. C., at ——. It merely noted that Procter's growth pattern, financial resources, experience in the field and management policies made it the most favorably situated potential entrant. Thus the Commission reasoned that Procter might have been induced to enter the liquid bleach market when that market had a prevailing price level lower than that necessary to attract entry by more remote competitors. The limitation potential competition places on pricing policies depends on the barriers to entry facing particular competitors, and increased insulation can stem not only from changes which make it more costly for any firm to enter the market, but also from limitation of the class of entrants to those whose entry costs are high. See Bain, Barriers to New Competition 21.

At first blush, a serious inconsistency seems to arise between the Commission's analysis of this potential competition, and its expressed fear that the merger might turn the field into one of big business competition by inducing other large firms to seek entry into the market. If Procter's entry could be shown to have increased rather than decreased the likelihood of additional entry then it could hardly be attacked because of adverse effect on the "condition of entry." And I think it irrelevant whether further entry might be by small or large firms. Although there are those who attach a talismanic significance to small firm competition, see *United States* v. *Von's*

opinion in *National Tea Co.*, 3 Trade Reg. Rep. ¶ 17,463, at 22,708. "The answer [in a § 7 case] can only be found in a careful and detailed analysis of the nature and economic condition of the industry, the structure of the relevant geographic markets, and the overall market power of the national chain and its capacity to bring it to bear in particular local markets."

*Grocery Co., supra,* at 275, I do not believe that competition between dynamic, well-managed large companies is less desirable than any other form. However, there is nothing in the record to show that the Commission's discussion of this point was more than mere speculation, and I cannot attach any real significance to it.

The Commission's analysis of the economies involved in this case is critical and I regret that the Court refrains from commenting upon it. The Commission—in my opinion quite correctly—seemed to accept the idea that economies could be used to defend a merger, noting that "[a] merger that results in increased efficiency of production, distribution or marketing may, in certain cases, increase the vigor of competition in the relevant market." 63 F. T. C., at ——. But advertising economies were placed in a different classification since they were said "only to increase the barriers to new entry" and to be "offensive to at least the spirit, if not the letter, of the antitrust laws." *Ibid.* Advertising was thought to benefit only the seller by entrenching his market position, and to be of no use to the consumer.

I think the Commission's view overstated and oversimplified. Proper advertising serves a legitimate and important purpose in the market by educating the consumer as to available alternatives. This process contributes to consumer demand being developed to the point at which economies of scale can be realized in production. The advertiser's brand name may also be an assurance of quality, and the value of this benefit is demonstrated by the general willingness of consumers to pay a premium for the advertised brands. Undeniably advertising may sometimes be used to create irrational brand preferences and mislead consumers as to the actual differences between products,[19] but it is very difficult to

---

[19] The Commission found, for example, that Clorox was identical to other liquid bleaches. Procter contended, and the Court of

discover at what point advertising ceases to be an aspect of healthy competition. See Bork, Contrasts in Antitrust Theory: I, 65 Col. L. Rev. 401, 411, n. 11. It is not the Commission's function to decide which lawful elements of the "product" offered the consumer should be considered useful and which should be considered the symptoms of industrial "sickness." It is the consumer who must make that election through the exercise of his purchasing power. In my view, true efficiencies in the use of advertising must be considered in assessing economies in the marketing process, which as has been noted are factors in the sort of § 7 proceeding involved here.

I do not think, however, that on the record presented Procter has shown any true efficiencies in advertising. Procter has merely shown that it is able to command equivalent resources at a lower dollar cost than other bleach producers. No peculiarly efficient marketing techniques have been demonstrated, nor does the record show that a smaller net advertising expenditure could be expected. Economies cannot be premised solely on dollar figures, lest accounting controversies dominate § 7 proceedings. Economies employed in defense of a merger must be shown in what economists label "real" terms, that is in terms of resources applied to the accomplishment of the objective. For this reason, the Commission, I think, was justified in discounting Procter's efficiency defense.

For the reasons set forth in this opinion, I conclude that the Commission was justified in finding that the Procter-Clorox merger entails the reasonable probability of a substantial increase in barriers to entry and of enhancement in pricing power in the liquid bleach industry and that its order must be upheld.

---

Appeals concluded, that Clorox employed superior quality controls. The evidence seemed to indicate that the regional and national brands were very similar, but that some local brands varied in strength.