**ICM REALTY, Plaintiff,**

v.

**CABOT, CABOT & FORBES LAND TRUST, Defendant.**

No. 74 Civ. 1675.

United States District Court,
S. D. New York.

July 12, 1974.

Shearman & Sterling, New York City, for plaintiff; George J. Wade, Edward J. Boyle, Lawrence G. Golde, James R. Hawkins, Edward L. Turner, III, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendant; Christopher Crowley, Bartlett H. McGuire, Hiram D. Gordon, Jack P. Levin, New York City, of counsel.

## MEMORANDUM

BONSAL, District Judge.

Plaintiff ICM Realty ("ICM") instituted this action on April 15, 1974 against defendant Cabot, Cabot & Forbes Land Trust ("CCF"), seeking a preliminary and permanent injunction to enjoin CCF from consummating contracts with five commercial banks holding shares of beneficial interest in ICM, under which CCF would acquire approximately 55.7% of the shares of ICM from the banks in exchange for shares of beneficial interest of CCF. ICM's amended complaint, which was filed on May 9, 1974, alleges violations by CCF of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; section 7 of the Clayton Act, 15 U.S.C. § 18; sections 9(a), 10(b), 14(e), and 29 of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. §§ 78i(a), 78j(b), 78n(e), and 78cc, and the rules and regulations of the Securities and Exchange Commission ("SEC") promul-

gated thereunder; [1] and common law. Jurisdiction is alleged pursuant to 28 U.S.C. §§ 1331(a) and 1337, 15 U.S.C. §§ 22 and 26, 15 U.S.C. § 78aa, and pendent jurisdiction.

On May 29, 1974 ICM moved for a preliminary injunction to enjoin CCF from violating the antitrust and securities laws. A hearing was held on the motion on June 5–10 and the Court heard oral argument on June 19, 1974.

Plaintiff ICM is a real estate investment trust ("REIT") organized in 1971 under the laws of Maryland. It is a consolidation of three REITs, the first of which was started in 1968. ICM has its principal office in New York City. Defendant CCF is a REIT organized in 1971 under the laws of Massachusetts as a Massachusetts business trust, and it has its principal office in Boston.

ICM has outstanding 3,011,382 shares of beneficial interest of which approximately two-thirds are held by six commercial banks [2] and other investors; these shares were issued pursuant to private placements and are restricted from trading. The remaining one-third are unrestricted shares of beneficial interest and are listed for trading on the American Stock Exchange. CCF has outstanding approximately 2,990,054 shares of beneficial interest which are listed for trading on the New York Stock Exchange.

Both ICM and CCF, as REITs, have elected to qualify as such under sections 856 et seq. of the Internal Revenue Code of 1954, as amended. They both primarily invest in real property, income-producing improvements on real property, and various interests secured by real property, and to be qualified as a REIT under the Internal Revenue Code, each must derive at least 75% of its gross income from a combination of rents from real property, interest on obligations secured by mortgages on real property or on interests in real property, gains from the sale or other disposition of real property, dividends or other distributions on and gains from the sale or other disposition of transferable shares in other REITs, or abatements and refunds of taxes on real property.

ICM and CCF have management contracts with Investors Central Management Corporation and CC & F Land Trust Advisers, Inc., respectively, which analyze and recommend investments, subject to approval by their respective Boards of Trustees.

Both ICM and CCF specialize in investing in subordinated land purchase-leasebacks. Under this form of real estate financing, the owner-developer of a shopping center, garden apartment project, office building, or other income-producing real property conveys title to the land to the REIT, but reserving title to the income-producing improvements on the land, and simultaneously leases back the land from the REIT under a long-term net lease. The REIT acquires title to the fee interest in the land subject to the prior rights of persons holding first mortgages and agrees to subordinate its interest in the land to future mortgage indebtedness created by the developer, including refinancing of existing mortgages. The REIT generally receives a fixed annual rental under the lease and a percentage rental based upon increases in gross revenues received by the developer from the use of the property and improvements thereon. The improvements become the property of the REIT on the termination of the lease.

As of November 30, 1973 ICM had invested more than 70% of its total portfolio of $62,187,636 in subordinated land purchase-leasebacks, and as of May 31, 1973 CCF had invested more than 50% of its total portfolio of $137,278,016 in land purchase-leasebacks and related mortgage loans generally subject to prior mortgage indebtedness. According to the testimony of Kenneth Campbell,

---

1. The 10b–5 claim was dismissed by the Court for lack of standing, by Memorandum filed June 6, 1974.

2. The six banks are: Citibank, Irving, Manufacturers Hanover, Marine Midland, Girard, and United California Bank.

publisher of Realty Trust Review, only three of the approximately 133 REITs reviewed and classified by Realty Trust Review have more than 35% of their portfolios invested in subordinated land purchase-leasebacks. Those three are ICM, CCF, and Property Capital Trust.

In the spring of 1973, CCF was seeking a way to expand its equity base in order to enable it to borrow more money with which to make new investments. Since ICM, unlike CCF, had little or no debt, CCF's investment staff saw a merger with ICM as a convenient way to expand CCF's equity base. In June of 1973, representatives of CCF met with representatives of ICM to discuss a possible merger. On June 26, 1973, CCF made a written offer to ICM pursuant to which ICM would have been merged into CCF on the basis of an exchange of .80 share of CCF for each share of ICM. This offer was considered by ICM and rejected on August 1, 1973. CCF made a second offer to ICM on October 23, 1973 increasing the ratio from .80 to .85, but this offer was also rejected by ICM on November 6, 1973.

This litigation was precipitated when CCF then embarked on a program to obtain control of ICM by acquiring the privately held shares of ICM held by the six banks in exchange for shares of CCF. Between August 1, 1973 and February 1, 1974 CCF had extensive contacts with the six banks with a view to negotiating a sale of their ICM shares for CCF shares. During this period, Arthur W. Viner (Managing Trustee of ICM and President and Chief Executive Officer of ICM's adviser) also had extensive contacts with the banks, urging them not to sell their ICM shares for CCF shares. CCF made a written offer to the six banks on January 17, 1974, and between January 25 and February 1, 1974 five of the six banks [3] accepted the offer and entered into contracts with CCF pursuant to which they agreed to exchange their ICM shares for CCF

shares at an exchange ratio of .75 CCF share for each share of ICM. Upon consummation, this would give CCF 55.-7% of the outstanding shares of ICM.

On February 4, 1974, CCF filed a statement with the SEC pursuant to Rule 13d–1 promulgated under section 13(d) of the Exchange Act, as amended by the Williams Act, which statement contains a brief description of CCF's proposed purchases of ICM stock from the banks and declares that CCF proposes to make a tender offer to the holders of the publicly held shares of ICM to exchange their ICM shares for CCF shares at the same exchange ratio as that accorded to the banks. Such tender offer is to be made subject to a registration statement under the Securities Act of 1933 and by means of a prospectus to be included therewith and the filing of a Schedule 13D with the SEC pursuant to section 14(d) of the Exchange Act and Rule 14d–1 promulgated thereunder. The statement goes on to say that CCF ultimately expects to combine ICM and CCF through a transfer of ICM's assets to CCF and thereafter to liquidate ICM.

ICM contends that CCF's proposed acquisition of the banks' ICM shares would violate the antitrust laws and that during its negotiations with the banks, CCF made false and misleading representations with respect to ICM in violation of the Williams Act.

## I

As the Court of Appeals recently reiterated in Missouri Portland Cement Co. v. Cargill, Inc., 498 F.2d 851 (2d Cir. 1974), quoting from Sonesta International Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973), there are two standards governing the issuance of preliminary injunctions in cases raising issues under the antitrust and securities laws:

> "The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable

---

3. The five contracting banks are: Citibank, Irving, Girard, Manufacturers Hanover, and Marine Midland.

success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly [sic] toward the party requesting the preliminary relief." (emphasis in original). 498 at 866. The Court of Appeals also noted in *Cargill:*

". . . the growing practice of companies that have become the target of tender offers to seek shelter under § 7 of the Clayton Act, 15 U.S.C. § 18. Drawing Excalibur from a scabbard where it would doubtless have remained sheathed in the face of a friendly offer, the target company typically hopes to obtain a temporary injunction which may frustrate the acquisition since the offering company may well decline the expensive gambit of a trial or, if it persists, the long lapse of time could so change conditions that the offer will fail even if, after a full trial and appeal, it should be determined that no antitrust violation has been shown." 498 at 854.

Unlike *Cargill,* a combination of ICM and CCF would be a horizontal merger since both specialize in investing in subordinated land purchase-leasebacks. This makes it necessary to consider the line of commerce, if any, here involved.

## II

ICM contends that CCF's acquisition of ICM would violate section 1 of the Sherman Act [4] and section 7 of the Clayton Act.[5] ICM argues that the relevant line of commerce is subordinated land purchase-leasebacks in the United States as a whole; that both it and CCF are major competitors in that line of commerce; and that a merger of the two would result in CCF having almost 23% of the market in subordinated land purchase-leasebacks, which would eliminate a substantial amount of competition between two present competitors.

CCF contends that the relevant line of commerce is the broader field of "secondary financing", in which line of commerce other REITs, insurance companies, pension funds, and other large investors compete in providing junior capital to real estate developers. CCF argues that it and ICM have small staffs and limited capital; that they are dwarfed by others with larger amounts of capital to invest in real estate ventures and that neither has substantial market power nor would their combination substantially lessen competition in the market for secondary financing. CCF also argues that there are no significant barriers preventing others from investing in subordinated land purchase-leasebacks whenever appropriate.

The criteria for determining the relevant line of commerce under section 7 of the Clayton Act also apply with respect to the Sherman Act. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). A line of commerce is defined in terms of its product dimensions and its geographic dimensions. In the present case, it is undisputed that the United States constitutes the geographic boundary of the relevant line of commerce since both ICM and CCF and other REITs as well invest in real estate in all parts of the United States. *Cf.* FTC v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); FTC v. Consolidated Foods Corp., 380 U.S. 592, 85 S. Ct. 259, 13 L.Ed.2d 183 (1965). It is

---

4. Section 1 of the Sherman Act provides in relevant part:
   "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . . "

5. Section 7 of the Clayton Act provides in relevant part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

also well settled that a service or cluster of services may constitute a relevant line of commerce within the meaning of the antitrust laws. *See* United States v. Grinnell Corp., *supra,* 384 U.S. at 573, 86 S.Ct. 1698; United States v. Philadelphia National Bank, 374 U.S. 321, 356, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1964).

In Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), the Supreme Court set forth the factors to be considered on a case-by-case basis in determining the relevant line of commerce:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. . . . The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." (footnotes omitted). 370 U.S. at 325, 82 S.Ct. at 1524.

*See also* Telex Corp. v. International Business Machines Corp., 367 F.Supp. 258, 336–338 (N.D.Okla.1973); Credit Bureau Reports, Inc. v. Retail Credit Co., 358 F.Supp. 780, 789–790 (S.D.Tex. 1971), aff'd, 476 F.2d 989 (5th Cir. 1973).

Real estate developers seek to obtain financing for at least 100% of their cost. Since a first mortgage loan on land typically does not exceed 75% to 80% of the value of the land, developers rely on secondary financing (any financing over and above the first mortgage loan) for the balance. Because secondary financing generally entails a higher risk than the traditional first mortgage, the return is higher.

Walter M. S. Buck (President of Latimer & Buck, mortgage bankers and brokers) and Bruce P. Hayden (founder of Hayden Associates, Inc., real estate consultants) both testified that the subordinated land purchase-leaseback is simply one of the forms that secondary financing can take. Other forms include second mortgages and wraparound mortgages,[6] which, as they testified, can be structured to provide rates and terms similar to those negotiated in subordinated land purchase-leasebacks.

Mr. Hayden testified that in his experience helping developers to structure their financial transactions, he never had a request for any specific type of financing. Rather, his clients ask him for a diagnosis of their particular needs and a prescription for whatever type of financing would best suit those needs. Whatever form is chosen can then be tailored to suit specific needs by the inclusion of specialized provisions relating, for example, to the term of the financing (long-term, medium-term, or short-term), the rate of return (a fixed rate or a contingent rate tied to the property's income production), options to repay or repurchase, amortization of principal, and equity participation. Mr. Buck also testified that in his experience as a broker, he has used several different forms for secondary financing including subordinated land purchase-leasebacks, second mortgages, wraparound mortgages, or a combination of these forms.

Jon F. Hanson, a developer of primarily shopping center properties, testified that while there are several forms of secondary financing, he finds that the

---

6. A wraparound mortgage is a form of secondary financing typically used on older properties having first mortgages with low interest rates in which a lender assumes the developer's first mortgage obligation and also loans additional money, taking back from the developer a junior mortgage in the total amount at an intermediate interest rate.

subordinated land purchase-leaseback gives him the best results in situations where he needs long-term financing. He testified, however, that he has never used a wraparound mortgage and that he was unaware that other forms of secondary financing could also be structured to provide long-term financing.

It was also brought out at the hearing that, in general, developers can and do move from one form of secondary financing to another, depending on tax and other considerations. A tax on the transfer of real property, for example, would favor the mortgage form over a subordinated land purchase-leaseback, and on the other hand, a tax on mortgage loans would favor the subordinated land purchase-leaseback form. A developer with appreciated property may prefer the mortgage form in order to avoid the immediate capital gains tax he would have to pay if he transferred title to the land.

Both Mr. Buck and Mr. Hayden testified that in light of the flexibility in different forms of secondary financing, if ICM or CCF were to raise their rates for subordinated land purchase-leasebacks, developers would either shift to other forms of financing or would obtain subordinated land purchase-leasebacks from some other sources.

Secondary financing, including subordinated land purchase-leasebacks, requires no advertising, no plant construction, no inventory, patents, licenses, or trade secrets. Mr. Hayden testified that it is a very personal business. The only requirements are capital to invest, some know-how, and some personal contacts. While it requires more care to negotiate secondary financing than first mortgage financing because the risks are greater, there is no evidence that the skills needed and the factors to be considered in negotiating subordinated land purchase-leasebacks are substantially different than in negotiating any other form of secondary financing, nor is there any evidence that any special expertise is required. Indeed, both ICM and CCF invest in forms of secondary financing other than subordinated land purchase-leasebacks.

Moreover, it appears that the percentage of ICM's and CCF's capital invested in land purchase-leasebacks is declining. In 1968 and 1969, ICM made 100% of its investments in the form of land purchase-leasebacks. In 1970 the percentage fell to 98%; in 1971 to 61%; in 1972 to 44%; and in 1973, ICM made only 11% of its investments in the form of land purchase-leasebacks. In 1971, CCF made 77% of its investments in the form of land purchase-leasebacks. In 1972, the percentage fell to 38% and in 1973 to 20%.

ICM has only four employees, including Mr. Viner, who are involved in reviewing and analyzing prospective investments. ICM's adviser has a total staff of approximately twenty-six employees, nine of whom have some professional, as opposed to clerical, responsibility for ICM's affairs. CCF has only nine "deal men" or salesmen who are concerned with making new investments. CCF's adviser has a total staff of approximately 55 employees, including clerks and secretaries.

The investments of both ICM and CCF in land purchase-leasebacks in recent years is as follows:

|  | ICM | | CCF | |
|  | Land Purchase-Leasebacks | Total Investments | Land Purchase-Leasebacks | Total Investments |
|---|---|---|---|---|
| 1971 | $3.5 million | $5.8 million | $39.7 million | $58.8 million |
| 1972 | $9.7 million | $22.0 million | $22.4 million | $58.5 million |
| 1973 | $1.1 million | $10.0 million | $15.0 million | $75.6 million |

The total assets of all 206 REITs in the United States have been estimated by the National Association of Real Estate Investment Trusts ("NAREIT"), a trade association, to be $18.4 billion as of December 1, 1973. In contrast, the comparable combined total assets of ICM and CCF ($253 million) make up less than 1.5% of that figure. CCF ranks thirty-fifth in size in a list of the top 40 REITs compiled by NAREIT, and ICM does not even appear on the list. Moreover, the 53 members of NAREIT which include land purchase-leasebacks as one of their primary investment categories have total assets of $6.2 billion, more than twenty-four times the combined assets of ICM and CCF.

The testimony also brought out that insurance companies and pension funds, with mammoth aggregates of capital, invest in secondary financing. All of the life insurance companies taken together, for example, had assets of approximately $239.7 billion in 1972, mortgage loans of $76.9 billion and real estate ownership of $7.29 billion.

The evidence at the hearing discloses that both ICM and CCF are investors. Both invest money obtained from others in real estate ventures, both investing primarily in secondary financing of real estate developments throughout the United States. Both say that they conduct a sophisticated form of business, and ICM contends that investments in subordinated land purchase-leasebacks are a particularly sophisticated form of investment. However, there is no substantial reason why any lender of money or any investor in the United States could not also use subordinated land purchase-leasebacks as a form of investment if the market conditions were appropriate and if, in comparison with the many other forms of real estate investment, the money lender or investor deemed it to be profitable. The only evidence that subordinated land purchase-leasebacks are unique in any significant way came from the mouths of the officers and trustees of CCF in various statements to their shareholders, to investors, and to ICM, as for example that if CCF acquired ICM, "[t]he combined trusts would be recognized as premier in their specialized area of of [sic] investment." However, there is not the slightest evidence that this expectation would be realized or that, even if it were, that it would cause the slightest impact on the broad field of secondary real estate financing.

■ In view of the foregoing, the Court concludes from the evidence that if a line of commerce is here involved, it is not subordinated land purchase-leasebacks, but secondary real estate financing. From this point of view, the impact of a combination of ICM and CCF would appear on the evidence adduced at the hearing to be *de minimis*. The Court notes, however, that with the exception of Mr. Hanson, no real estate developers testified at the hearing, and their views have an important bearing on these issues.

Accordingly, the Court finds with respect to the antitrust issues that ICM has not demonstrated a probability of success on the merits, and despite the fact that the combination of ICM and CCF would be a horizontal merger, the Court does not believe, for the reasons set forth above, that on the basis of the evidence so far ICM has raised sufficiently serious questions going to the merits to make them a fair ground for litigation.[7]

### III

With respect to the Williams Act claims,[8] ICM contends that CCF's offer-

---

7. In reaching this determination, the Court notes that there is no dispute that REITs are subject to the provisions of section 1 of the Sherman Act, and the Court assumes, but without deciding, that REITs are also subject to the provisions of section 7 of the Clayton Act. See United States v. Philadel-phia National Bank, 374 U.S. at 348, 83 S.Ct. at 715.

8. Section 14(e) of the Exchange Act, 15 U. S.C. § 78n(e), provides in relevant part:
   "It shall be unlawful for any person to make any untrue statement of a material

ing circular to the banks of January 17, 1974 contained two false and misleading statements: 1) that CCF "undertook a full scale review of the Kassuba properties and the balance of the ICM portfolio" in preparing its offer; and 2) that "[a]fter this review, CC&F Land Trust Advisers . . . estimated that there exist[ed] the significant potential for investment losses approximating $13.5 million, and a permanent reduction of investment income exceeding $1 million . . . ." ICM contends that CCF's review was brief and superficial and that the estimate of potential losses of $13.5 million was exaggerated.

On the other hand, CCF contends that the representations made to the banks were reasonable and accurate; that they were clearly identified as statements of opinion about which judgments might differ; and that the banks, as sophisticated investors, were not misled.

On December 19, 1973, when CCF's trustees met to consider making an offer to the six banks holding ICM shares, the trustees assumed that the portfolios of the two trusts were generally comparable. To check that assumption, Gordon E. Emerson (Managing Trustee of CCF and President of CCF's adviser) directed that the CCF investment staff make a survey of ICM's investments. Mr. Emerson had noted that ICM had a number of investments in properties developed by Walter J. Kassuba, who was known to be in financial difficulties. Further investigation revealed that mortgage payments on ICM's Kassuba properties were several months in arrears and that there were some overdue taxes. An employee of John Hancock Mutual Life Insurance Company, which held first mortgages on two of the six properties, described the investments as "a shambles." Later, Mr. Emerson became aware that on December 21, 1973 Mr. Kassuba had filed under Chapter XI of the Bankruptcy Act.

Based on this information, Mr. Emerson directed that a more general survey of the ICM portfolio be made, and this was done by a task force of some twenty employees of CCF's adviser. A written report was prepared, which included as much objective data (such as the currency of first mortgages, tax and utilities payments, and levels of occupancy) as it was possible for the task force to gather in the short time available. The staff of CCF's adviser then met to review the factual data and to come up with an estimate of the potential for loss in the ICM portfolio. Terence Considine (Senior Vice President of CCF's adviser) testified that after review and discussion, the figure they settled on as representing the potential for loss "if worst came to worst" was $13.5 million.

The cover page of the offering circular to the banks stated:

"The estimates utilized and the judgments and assumptions employed should be evaluated as such and represent only the present opinions of the management of [CCF]."

The offering circular also contained cautionary language to the effect that "numerous subjective judgments were involved" in evaluating the information presented therein and that CCF had arrived at only "general conclusions . . . as to the overall quality of the [ICM] properties." Moreover, the statement itself which is alleged to have been misleading represents only that there exists the "significant potential" for investment losses "approximating $13.5 million."

In addition, the testimony at the hearing brought out that Mr. Viner had extensive contacts with four of the five contracting banks prior to their accept-

fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation."

ances of CCF's offer, urging them not to accept the offer, and numerous contacts with the five banks after the contracts were entered into, during which he attempted to persuade the banks not to go through with these contracts. Viner reviewed ICM's portfolio with the banks, urging that the potential loss was not as great as CCF would have led them to believe.

The banks are large, sophisticated investors with ample facilities to make their own investigations. There was no evidence that any of the five banks has ever indicated that it was misled or that it desired to withdraw from its contract with CCF. None of the banks have taken any part in this action either as parties or as witnesses. Indeed, there was evidence that one of the banks informed ICM that it was not misled by CCF.

█ In view of the foregoing, it appears that the representations made to the banks were in the nature of opinions and as such were not false or misleading. Accordingly, the Court finds with respect to the Williams Act issues that ICM has demonstrated neither a probability of success on the merits nor that there are sufficiently serious questions going to the merits to make them a fair ground for litigation.

## IV

█ With respect to balancing the hardships, it is significant that CCF has agreed to "hold separate" any shares of ICM which it may obtain pending a final determination of this action. Under this hold separate agreement, CCF would place its ICM shares in escrow and would refrain from exercising any voting rights which it might acquire as a shareholder of ICM to do any of the following: (1) remove Investors Central Management Corporation as adviser of ICM; (2) remove any of the present trustees of ICM; or (3) take any action in furtherance of a merger or consolidation of the assets of ICM and CCF. In addition, CCF would agree to refrain from interfering with management decisions relating to the conduct of ICM's normal business affairs.

ICM contends that the denial of its motion for a preliminary injunction would subject it to irreparable injury. Mr. Viner testified that ICM's customers would be doubtful and uncertain about doing business with it, fearing that ICM might be liquidated before the business could be completed or that its personnel or investment policies might change; that ICM's management personnel would be in suspense and uncertain about the future, which would make it difficult to raise additional capital or to make long range plans; that the acquisition of ICM shares might result in ICM's being delisted or suspended from trading on the American Stock Exchange; and that if CCF acquired and thereafter was required to divest itself of any substantial amount of ICM shares, the effect would likely be to depress further the market price of ICM shares.

On the other hand, CCF contends that if a preliminary injunction is issued, it will be irreparably injured because the contracts with the five banks provide that CCF must close with the banks by September 30, 1974, and that the delay occasioned by the issuance of a preliminary injunction may cause the contracts to "come undone." In addition, CCF contends that any delay in closing will delay CCF's ability to use its expanded equity base to issue new debt and to engage in new financing.

In view of CCF's hold separate agreement, the Court finds that ICM has not shown that the balance of hardships tips in its favor. While ICM's future may be to some extent uncertain, the Court of Appeals in *Cargill* recently suggested that district judges should take the argument of serious harm to a corporation due to "jitters in executive suites with a fair amount of salt" since the possible demoralizing effect is generally limited to a fairly short period. 498 at 869 n.

36. Here, the uncertainty will persist only until the trial, which should occur within a few months. Mr. Viner testified that ICM had recently closed a number of transactions, which is some evidence that the uncertainty has not so far caused an undue disruption of ICM's business.

The alleged disruption of the market in ICM shares in the event that CCF should be required to divest the ICM shares is speculative. No reason is advanced why CCF would want to dump the ICM shares at a substantial loss. The possibility that ICM shares will be delisted is also speculative, since the existing floating supply would not be affected until a tender offer is made. During the life of the hold separate order, CCF will simply be an ICM shareholder without voting rights.

If a preliminary injunction were issued, CCF could not close its agreement with the banks by September 30, 1974 as it has promised, giving a possible out to the banks. As the Court of Appeals stated in *Cargill:*

> "Endeavoring to probe the intention of the framers of the Celler-Kefauver amendment to § 7 of the Clayton Act as best we can, we do not think they meant to endow incumbent management of a target company with the power to block free trade in its securities unless the anti-trust violation was fairly clear or the potential damage to the corporation decisively outweighed that to the would-be acquirer." (Footnote omitted). at 870.

In view of CCF's hold separate agreement, the balance of hardships does not tip decidedly in ICM's favor. Indeed, the preservation of the status quo is best served by a denial of ICM's motion for a preliminary injunction and the entering of a hold separate order against CCF.

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

ICM's motion for a preliminary injunction is denied.

It is so ordered.