*UNITED AIR LINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD [HOLD-
ING COMPANY REORGANIZA-
TIONS], Respondent.

TIGER INTERNATIONAL, INC., a
corporation, et al., Petitioners,

v.

CIVIL AERONAUTICS BOARD,
Respondent (two cases).

UNITED AIR LINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

BRANIFF INTERNATIONAL CORPO-
RATION, a corporation, et
al., Petitioners,

v.

CIVIL AERONAUTICS BOARD,
Respondent.

Nos. 75–2165, 75–2211, 76–1099,
76–1101 and 76–1118.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 18, 1977.

Decided Nov. 28, 1977.

As Amended Jan. 23, 1978.

*For convenience the court will refer to these
cases hereafter as *United Air Lines, Inc. v Civil*
*Aeronautics Board [Holding Company Reorga-*
*nizations]*.

Robert L. Stern, Chicago, Ill., for petitioner in Nos. 75–2165 and 76–1101.

H. Templeton Brown, Henry L. Hill and Harold E. McKee, Jr., Chicago, Ill., were on the brief for petitioner in Nos. 75–2165 and 76–1101.

J. Stanley Stroud, Chicago, Ill., also entered an appearance for petitioner in Nos. 75–2165.

Charles N. Brower, Washington, D. C., with whom John Lewis and Alan L. Morrison, Washington, D. C., were on the brief, for petitioners in Nos. 75–2211 and 76–1099.

J. W. Rosenthal, Washington, D. C., entered an appearance for petitioners in No. 75–2211.

Alexander E. Bennett, Washington, D. C., with whom Thomas J. McGrew, Washington, D. C., was on the brief, for petitioners in No. 76–1118.

Thomas L. Ray, Atty., Civil Aeronautics Bd., Washington, D. C., with whom Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, Robert L. Toomey, Atty., Civil Aeronautics Bd., and Carl D. Lawson, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent. Barry Grossman and Lee I. Weintraub, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent in No. 75–2165.

Peter R. Steenland, Jr., Atty., Civil Aeronautics Bd., Washington, D. C., entered an appearance for respondent in Nos. 75–2165 and 75–2211.

Samuel R. Simon, Atty., Dept. of Justice, Washington, D. C., also entered an appearance for respondent in No. 75–2211.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Concurring opinion filed by Circuit Judge McGOWAN, in which Chief Judge BAZELON joins.

MacKINNON, Circuit Judge:

United Air Lines, Inc. (United), The Flying Tiger Line, Inc. (Tiger), and Braniff Airways, Inc. (Braniff), formed holding companies through corporate reorganizations, respectively: UAL, Inc.; Tiger International, Inc. (formerly Flying Tiger Corp.); and Braniff International Corporation. After these reorganizations the three air carriers retained their certificates of public convenience and necessity, but each had become a subsidiary of its respective holding company. Each holding company then acquired other non-air carrier subsidiaries which were engaged in diversified businesses.[1]

Subsequent to the United and Tiger reorganizations, but concurrent to that of Braniff, the Civil Aeronautics Board (CAB) instituted its *Air Carrier Reorganization Investigation*. At the close of this proceeding, the Board developed a regulatory program for these three air carriers covering their relations with their respective holding companies. The regulatory program, designed to protect the financial health of the carriers, requires the reporting and prior CAB approval of various corporate activities of the carriers in their relations with their affiliated companies. Basing its action upon various of its regulatory powers under the Federal Aviation Act of 1958,[2] the Board amended the certificates of the three airlines to require their compliance with its regulatory program. The carriers and the holding companies[3] have petitioned for review of the Board's orders.

---

1. The record indicates that UAL, Tiger International and Braniff International acquired, in addition to the air carrier petitioners, the following subsidiaries during the pendency of the *Air Carrier Reorganization Investigation:*

    UAL, Inc.
    Western International Hotels, Inc. (owns and operates hotels) (J.App. 564, 618)
    Tiger International, Inc.
    North American Car Corp. (leases specialty railroad cars)
    National Equipment Rental, Ltd. (leases aircraft, computers and general industrial equipment) (J.App. 389–407, 619)
    Braniff International Corp.
    Braniff International Hotels, Inc. (owns and operates hotels and recreational facilities)

    Braniff Education Systems, Inc. (provides vocational education services) (J.App. 454–62)

2. Section 401(g), 49 U.S.C. § 1371(g) (1970), together with sections 102, 204(a), 401(e)(1), 407(a), 407(e), 408(d), and 415, 49 U.S.C. §§ 1302, 1324(a), 1371(e)(1), 1377(a), 1377(e), 1378(d), and 1385 (1970).

3. In two petitions for review of the CAB orders, both the holding company and the air carrier subsidiary have joined: No. 76–1118, Braniff International Corp. (holding company) and Braniff Airways, Inc.; No. 75–2211, Tiger International, Inc. (holding company) and The Flying Tiger Line, Inc. In Nos. 75–2165 and 76–1101, only United Air Lines, Inc., the air carrier, is petitioner. Its holding company parent, UAL, Inc., has not joined. We distinguish be-

## I.

Prior to 1969, several certificated air carriers were acquired as subsidiaries by "conglomerate" corporations who were not themselves air carriers, and other air carriers diversified by acquiring non-air carrier subsidiaries. In 1969, United became the first air carrier to attempt to diversify by creating a holding company so that the carrier became the subsidiary of a holding company owned, at the outset, by the same stockholders and governed principally by officers and directors who served the "old" air carrier. United petitioned the Board to disclaim jurisdiction over the reorganization under section 408(a) of the Federal Aviation Act, which at that time provided:

It shall be unlawful unless approved by order of the Board as provided in this section—

.     .     .     .     .

(5) For any air carrier or person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to acquire control of any air carrier in any manner whatsoever;

.     .     .     .     .

49 U.S.C. § 1378(a) (1970). The Board concluded that section 408(a)(5) was inapplicable to United's internal reorganization and approved the transfer of the certificate to the "new" air carrier subsidiary. Order 69–4–67 (Feb. 4, 1969).

Subsequently, Tiger, a scheduled all-cargo carrier, petitioned for Board disclaimer of jurisdiction over a similar reorganization. In the interim, section 408(a)(5) had been amended, adding to the list of persons whose acquisition of control of an air carri-

er required Board approval: "or any other person."[4] The Board concluded that this transaction was within its jurisdiction under the amended section 408(a)(5), and therefore refused to disclaim jurisdiction. Order 69–12–121 (Dec. 29, 1969). Tiger's reorganization, however, was approved subject to conditions requiring reporting and prior CAB approval of certain transactions. Order 70–6–119 (May 5, 1970). Tiger accepted these conditions and the reorganization was consummated.[5] In 1970, Airlift International, another cargo carrier, submitted a like plan of reorganization. The Board asserted jurisdiction and approved subject to similar restrictions, Orders 70–6–120 (June 19, 1970) and 70–9–8 (Sept. 2, 1970), but Airlift's reorganization plan was abandoned and it is not now a party to this action.

Finally, in 1971, Braniff petitioned the Board for approval of a similar reorganization. Rather than disclaim jurisdiction or approve subject to conditions, the Board instituted an investigation, denominated the *Air Carrier Reorganization Investigation*, No. 24283. Order 72–3–27 (March 10, 1972), J.App. 13. The purpose of the investigation, as announced in the order, was to determine the probable effects of the creation of air carrier holding companies upon the air carriers, whether Braniff's and similar future reorganizations should be approved, and if so subject to what conditions. The Board also reopened the United and Tiger proceedings and joined them as parties to the *Investigation*. It noted, "Since the outcome of the investigation may have industry-wide effect, petitions of other air carriers for leave to intervene will be favor-

---

tween the holding and operating company parties in references in this opinion only where expressly noted.

4. Act of Aug. 20, 1969, Pub.L. No. 91–62, 83 Stat. 103. Section 408(a)(5) now provides that Board approval is required

For any air carrier or any person controlling an air carrier, any other common carrier, any person engaged in any other phase of aeronautics, *or any other person* to acquire control of any air carrier in any manner whatsoever  .   .   . .

49 U.S.C. § 1378(a) (1970) (emphasis added).

5. Tiger sought review of the Board orders asserting jurisdiction and establishing conditions, and of subsequent orders implementing these conditions, in the Ninth Circuit. That court recently held that the challenge to the original orders was barred by the 60-day limitations period of section 1006(a) of the Act, 49 U.S.C. § 1486(a). It rejected the latter challenge on the merits. *Tiger International, Inc. v. CAB*, 554 F.2d 926 (9th Cir. 1977).

ably considered." *Id.* at 5, J.App. 17. On August 28, 1972, however, the Board denied DOT's motion to join as parties all certificated air carriers in order that their experiences with various forms of diversification could be made part of the record. Order 72–8–118, J.App. 19.

A proceeding, in which briefs were submitted and argument heard, was conducted before a Board administrative law judge (ALJ). The Departments of Transportation (DOT) and Justice, and the Board's Bureau of Operating Rights (BOR) participated along with the three petitioners. Two other air carriers intervened at this stage, but one soon withdrew and neither is now a party. The carrier parties argued that diversification was beneficial to the financial health of air carriers, and urged that no restrictions at all be imposed upon diversified carriers, whether reorganized under the holding company form or otherwise. Each of the governmental parties agreed that diversification offered some advantages to air carriers, but also warned that it posed significant hazards.

The BOR urged that Braniff's reorganization be approved subject to conditions similar to those already applied to Tiger, that the same controls be made applicable to United, and that a rulemaking proceeding be initiated to impose similar controls on all diversified carriers. It recommended that the carriers be required to enter into a "transaction agreement" with the Board covering each class of regulated transaction. Justice and DOT adopted an intermediate position, agreeing that the Board had some regulatory authority in this area but arguing that a more limited regulatory program was appropriate, primarily involving reporting requirements.

The ALJ issued a voluminous initial decision on August 27, 1973, J.App. 159. He essentially agreed with the position advanced by the BOR. The ALJ noted initially that there was relatively little experience with airline-formed holding companies upon which to base an evaluation of their effect upon air carriers. By analogy to the experience of other industries, however, particu-

larly the railroad industry, he concluded that the holding company form presented both advantages and hazards to air carriers. In addition, the ALJ found some evidence of relatively minor abuses of the holding company form by UAL and Tiger International, and concluded that the holding company form of diversification posed somewhat greater dangers for air carriers than did the other forms. However, he concluded that the Act did not prohibit such reorganizations by air carriers *provided* they were subjected to a regulatory plan like that recommended by the BOR.

The ALJ ultimately decided that Braniff's reorganization should be approved subject to conditions. He also concluded that the same conditions should be imposed upon United and Tiger under the Board's continuing section 408 power, notwithstanding the Board's initial disclaimer, before the 1969 amendment of section 408(a)(5), of such jurisdiction over the United reorganization. In addition, the ALJ recommended that the Board promulgate rules of general applicability to all diversified air carriers, whatever the form of their diversification. Indeed, he assumed that "[c]learly the Board will not adopt one set of rules to govern the carriers who were parties hereto and a different set for those who were not." Initial Decision 208, J.App. 375. The record in the present proceeding, the ALJ concluded, was sufficient for the promulgation of such rules without a separate rulemaking proceeding.

The Board elected to review the ALJ's initial decision in its entirety. Before it decided the matter, United moved to restructure the investigation as a rulemaking proceeding of general applicability, and a number of other air carriers, concerned about the reach of the ALJ's recommendations, sought leave to intervene. The Department of Justice supported United's motion, while BOR recommended that the motion to restructure the investigation be denied but that a rulemaking proceeding be initiated if the Board determined that rules of general applicability were warranted. The Board denied both United's motion and

the motions to intervene, but invited the submission of *amicus curiae* briefs. Order 73–11–8 (Nov. 5, 1973), J.App. 21.[6]

In an opinion released on September 12, 1975, Orders 75–10–65 & 75–10–66, J.App. 36, the Board accepted most of the ALJ's factual findings but differed on the scope and form of the remedy to be applied. In accord with its earlier orders, the Board limited its consideration to carrier-formed holding companies, concluding that this form of diversification presented the greatest hazards to the public. It agreed with the ALJ both that diversification offered some possible advantages for air carriers, and that it also posed a number of dangers, most of which were only potential but were nevertheless serious. It also agreed with the ALJ that such reorganizations were not prohibited by the Act if appropriately regulated. But contrary to the ALJ's recommendations and assumptions, the CAB elected neither to promulgate regulations of general applicability nor to institute a rulemaking proceeding. Rather, the Board determined simply to amend the certificates of the three airlines that were the principal parties in the investigation to impose conditions similar to those suggested by the BOR and ALJ. In sum, the Board concluded that the regulatory plan adopted by the Board should include four principal areas: (1) the adoption of Transaction Guidelines by the Board which will represent the views of the Board and, thereby, assist the carriers in formulating the Transaction Agreements, (2) a limitation on intercompany transactions between the air carrier and its affiliates, and between affiliates which affect the air carrier, to those areas specified in Transaction Agreements filed by the particular carrier with the Board 30 days prior to the agreements' effectiveness, (3) the filing

of verified quarterly reports of such transactions, which will describe the transactions that have occurred during the quarter, thus permitting the Board to review and determine whether the transactions were conducted in accordance with the particular Transaction Agreement on file with the Board, and (4) the filing of "Performance Monitoring Reports" by the carrier along the lines proposed by the administrative law judge;

.     .     .     .     .

*Id.* at 4, J.App. 41. The Board's regulatory program differs from that suggested by the ALJ principally in that it requires the filing of a separate "transaction agreement" for each transaction. The Board amended the certificates of each of the parties to require conformance with the regulatory plan appended to its opinion, *id.* at App. A, J.App. 81.

DOT, BOR and Braniff each petitioned for reconsideration of the Board's orders, and these petitions were denied in relevant part on January 30, 1976. The motions of United and Tiger for a stay *pendente lite* were simultaneously denied. Order 76–1–121, J.App. 132. United, Tiger and Braniff then petitioned this court for review.

## II.

Initially, Tiger contends that its internal reorganization, and presumably that of Braniff, were only "paper transactions"[7] not amounting to an acquisition of control of an air carrier by "any . . . person" under section 408(a)(5), and that therefore the Board lacked jurisdiction over these transfers. The term "person" is defined by section 101(27) of the Act, 49 U.S.C. § 1301(27), to mean

any individual, firm, copartnership, corporation, company, association, joint-stock

---

6. The Board in this order also granted Braniff's motion to sever its application from the investigation and approve that application subject to conditions. The Board expressly retained jurisdiction to require Braniff to terminate its holding company arrangement or accept further conditions as required by the public interest. *Id.* at 3, J.App. 23.

7. It is something more than a "paper transaction" to transfer absolute control of one of the major air carriers of the world from a board of directors and officers whose one fiduciary duty is owed to that air carrier, to a board and officers whose fiduciary duty is to be "diversified" to include the operation of other corporations. *See* text *infra.*

association, or body politic; and includes any trustee, receiver, assignee, or other similar representative thereof.

This statutory definition is clearly broad enough to encompass the holding companies created by the air carrier petitioners. The plain meaning of section 408(a)(5), as amended, read together with the definition in section 101(27), thus defeats Tiger's argument that there was no transfer to a "person." This argument is specious.

Tiger argues, however, that the legislative history of the 1969 amendment to section 408(a)(5) supports its position. Despite the facial clarity of the section's language, it urges, the court should nevertheless consider the legislative history in determining its meaning. Tiger relies principally upon *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940), in which the Supreme Court indicated that no "rule of law" forbade reference to legislative history "however clear the words may appear on 'superficial examination.'" The history of Pub.L. No. 91–62, Tiger continues, reveals that the addition of "or any other person" to that section was motivated solely by a desire on the part of Congress to close a "loophole" that excluded CAB jurisdiction over transfers of air carriers to "conglomerate"[8] parents that were neither common carriers nor involved in any phase of aeronautics. *See, e. g.*, H.R.Rep. No. 91–261, 91st Cong., 1st Sess. 2–3 (1969). Since the history reveals no intent to grant jurisdiction over "internal reorganizations," Tiger concludes we should not read the section to so provide.

This argument, however, meets itself coming back. In the end result, all talk of "internal" reorganization is meaningless because the resulting carrier-created holding company will itself become a conglomerate and ultimately exercise "external" control over the air carrier and the other diversified corporations. It is true that the principal personnel of the air carrier may initially dominate the holding company, and that the initial shareholders of the holding company are the former shareholders of the air carrier. However, after the acquisition of the other subsidiaries, the interests of the holding company shareholders and management are no longer confined to the air carrier and that is the whole purpose for creating the holding company. The fiduciary duties of the directors and officers of the holding company, after diversification, extend to all corporations under its control. In such circumstances, conflicts in duty may arise between the separate interests of the various affiliates, and there is no assurance that the best interests of the air carrier, or any other controlled company, will always predominate to the fullest extent, as though they were the sole concern of the officers and directors, as previously. It is a fact of life that those charged with managing two corporations have *dual* responsibilities that may not always mesh to serve the best interests of both companies. Their loyalties become divided. For these reasons, we conclude that the expressed intent of Congress to extend 408(a)(5) to provide CAB jurisdic-

---

8. A "conglomerate" corporation in common legal parlance is one resulting from conglomerate acquisitions or mergers. The terminology derives from judicial enforcement of section 7 of the Clayton Act. *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577, 87 S.Ct. 1224, 1230, 18 L.Ed.2d 303 (1966), states, "[a]ll mergers are within the reach of § 7 [of the Clayton Act] and all must be tested by the same standard, whether they are classified as horizontal, vertical, conglomerate 2 or other." (Footnote 2 provides: "A pure conglomerate merger is one in which there are no economic relationships between the acquiring and the acquired firm.").

Congress had described "conglomerate mergers" as "those in which there is no discernible relationship in the nature of the business between the acquiring and the acquired firms." H.R.Rep. No. 1191, 81st Cong., 1st Sess. 11 (1949). *Kennecott Copper Corporation v. FTC*, 467 F.2d 67, 75 (10th Cir. 1972) (Peabody Coal); *United States v. International Telephone & Tel. Corp.*, 306 F.Supp. 766, 774 (D.Conn.1969) (Grinnell Corp. and Hartford Insurance Co.); *United States v. General Dynamics Corporation*, 258 F.Supp. 36, 56 (S.D.N.Y.1966) (Liquid Carbonic); *Smith-Victor Corporation v. Sylvania Electric Products, Inc.*, 242 F.Supp. 315, 318 (N.D.Ill.1965). Conglomerate mergers may also involve "product-extension," *Procter & Gamble, supra*, and "market-extension," *Smith-Victor, supra*. A "horizontal" combination involves competitors and a "vertical" combination involves complementary facilities.

tion over transfers to "conglomerate" corporations is broad enough to grant jurisdiction over so-called "internal" transfers to carrier-formed holding companies created for the purpose of diversification. There is no indication that Congress intended to limit the application of the amendment from reaching some form of conglomerates that petitioners would by definition read out of the act's objectives. It is the eventual operation of the resulting corporate organization, not the means used to achieve it, that is the primary concern of the Board. Therefore, the operation and propriety of the acquisition and inclusion of air carriers in all forms of diversified holding companies, whether they be "horizontal, vertical, conglomerate or other," are to "be tested by the same standard" under the Federal Aviation Act. The Supreme Court made the quoted statement with respect to mergers under the Clayton Act in *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1966), because each such organization possesses the potential for conflicts of interest.

In addition, while *American Trucking* places some limitations on the doctrine that resort to legislative history may be had only where a statute is "ambiguous," the principal use of legislative history remains to determine legislative intent and to clarify the meaning of statutes so as to avoid ambiguity and absurd or unreasonable results. *See* 310 U.S. at 543, 60 S.Ct. 1059. We find no mandate in logic or in case law for reliance on legislative history to reach a result *contrary* to the plain meaning of a statute, particularly where that plain meaning is in no way unreasonable. Had Congress intended the 1969 amendment to apply only to transfers to corporations with a past conglomerate history, it could easily have used language that was so limited, yet it chose language that was considerably broader. Moreover, the resulting conglomerates here are not outside even the limited congressional intendment admitted by Tiger. To read section 408(a)(5) as urged by Tiger would be to open yet another "loophole," yet one that was both illogical and completely invisible on the face of the statute. We decline to do so.

## III.

Petitioners' principal contention is that the controlling statute does not authorize the Board to impose controls over dividend declarations, tax allocation agreements and other intercorporate transactions between a scheduled air carrier and its affiliates. Rather, they contend, the provisions of the Act are narrow and specific, and that to read the Act as granting the broad implied powers asserted by the Board would render its specific provisions a nullity. The Board concedes that the Act provides it with no express power to regulate dividends, intercorporate payments, or tax allocation agreements. It argues, however, that the aggregate of its express powers, by implication, provides it with such power. Unlike the ALJ, who relied principally upon the Board's power to approve or disapprove transfers of air carriers under section 408(a)(5), the Board relies principally upon its power to amend the carriers' certificates of convenience and necessity under section 401(g). We also note its extremely broad rulemaking power. The CAB also draws upon sections 102, 204(a), 401(e)(1), 407(a), 407(e), 408(d), and 415 to support its position. These powers confer very substantial regulatory authority.

Section 401(g), 49 U.S.C. § 1371(g), provides that

> [t]he Board . . . upon its own initiative, after notice and hearings, may alter, amend, modify, or suspend any such certificate, in whole or in part, if the public convenience and necessity so require . . . . .

Section 102, 49 U.S.C. § 1302, requires the Board to consider various factors "as being in the public interest, and in accordance with the public convenience and necessity," including "foster[ing] sound economic conditions in[ ] such transportation," and "[t]he promotion of adequate, economical, and efficient service by air carriers . . . . ."

Section 204(a), 49 U.S.C. § 1324(a), generally empowers the Board to conduct investigations, issue orders and rules, and "to

make and amend such general or special rules, regulations, and procedure . . . as it shall deem necessary to carry out" its statutory purposes. Authority to make "special rules," etc., is a very broad power. It implies power to deal with special situations by rules that may be based on a reasonable classification of affected parties. The Board's power to attach "[t]erms, conditions and limitations" to the certificates of air carriers "as the public interest may require" is established in section 401(e)(1), 49 U.S.C. § 1371(e)(1).

In support of the provisions of its orders requiring the reporting of information by the petitioners, the Board draws on several additional sections in Subchapter IV which Congress entitled: "Air Carrier Economic Regulation." Section 407(a), 49 U.S.C. § 1377(a), empowers the Board to require the filing of "special reports" by regulated carriers, while section 407(e) provides that the Board "shall at all times have access . . . to all accounts, records, and memoranda" of any carrier. This subsection also applies to persons "having control . . . or affiliated with any air carrier . . ." Section 408(d), 49 U.S.C. § 1378(d), grants the Board a similar right, "to the extent found reasonably necessary," to inspect the books and property of any "person, not an air carrier, . . . authorized, pursuant to this section, to acquire control of an air carrier . . . ." The power to "inquire into the management of the business of any air carrier," and to obtain "full and complete reports" in connection with such inquiries, from such air carriers "and from any person controlling or controlled by, or under common control with, such air carrier," is found in section 415, 49 U.S.C. § 1385.

■ From the related statutes the Board derives broad powers which are quite specific with respect to its authority where companies controlling air carriers are concerned. Thus, we cannot accept the petitioners' sweeping argument that the powers of the CAB are "narrow" or that it lacks all authority to regulate perceived dangers from uncontrolled diversification by air car-

riers. The provisions of the Act outlined above give the Board considerable general authority to ensure the continued financial viability of air carriers. We have previously held that the various sections of the Act, both "procedural" and "substantive," may be read together in determining the scope of the Board's powers:

> Section 204(a) confers broad regulatory authority upon the Board, and while the section is basically procedural, it may constitute part of the basis of substantive rulemaking authority, when combined with other provisions of the Act. . .

*Deutsche Lufthansa Aktiengesellschaft v. CAB*, 156 U.S.App.D.C. 191, 197–98, 479 F.2d 912, 918–19 (1973). *Accord, National Airlines v. CAB*, 113 U.S.App.D.C. 146, 151–52, 306 F.2d 753, 758–59 (1962).

■ Similar decisions have been reached regarding the powers of other regulatory agencies. For example, Mr. Justice Brennan, in a cogent plurality opinion rejecting an analogous challenge to the power of the Federal Communications Commission, concluded that the power to regulate cablecasting in order to protect the financial viability of television broadcasters was "reasonably ancillary" to the Commission's power over broadcasting under the Federal Communications Act. *United States v. Midwest Video Corp.*, 406 U.S. 649, 669, 92 S.Ct. 1860, 32 L.Ed.2d 390 (1972). The Supreme Court in *American Trucking Ass'ns v. United States*, 344 U.S. 298, 308–14, 73 S.Ct. 307, 97 L.Ed. 337 (1953) held that the Interstate Commerce Commission possessed the power, implied from a combination of provisions of the Interstate Commerce Act, to regulate motor carrier equipment leasing practices in order "to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system." 344 U.S. at 310, 73 S.Ct. at 314. Similarly, the Second Circuit has upheld rules governing the provision of computer data processing services by communications common carriers "generically based upon the primary charge of the [Federal Communications] Commission

that its carriers provide efficient and economic service to the public." *GTE Service Corp. v. FCC*, 474 F.2d 724, 730 (2d Cir. 1973). These decisions, based upon statutory grants of power not unlike those which the Board possessed here, convince us that the CAB may rely upon a combination of sections of the Federal Aviation Act in regulating the actions of air carriers and their affiliates in order to protect the financial integrity of the carriers so as to foster sound economic conditions in air transportation.

A contrary result is required, petitioners contend, by the Supreme Court's decision in *CAB v. Delta Air Lines*, 367 U.S. 316, 81 S.Ct. 1611, 6 L.Ed.2d 869 (1960). In that decision, the Court held that the specific provision of section 401(g), which states that the Board "after notice and hearings" may amend an air carrier's certificate, barred the CAB from amending a certificate without a hearing. "[T]he Board is entirely a creature of Congress and the determinative question is . . . what Congress has said it can do," the Court noted, and this provision was held sufficiently "unequivocal" that the Board should not avoid its effect. 367 U.S. at 322–23, 81 S.Ct. at 1617. In the present case, the Board seeks not to avoid the Act's specific terms, but to exercise powers clearly implied by the broad terms of the Act. Nothing in *Delta Air Lines* bars this exercise. No "hearing" question is involved here.

Petitioners also contend, however, that the legislative history of the Act indicates that Congress affirmatively intended to withhold from the CAB the authority to regulate the financial management of air carriers and their affiliates. They assert that the Congress, shortly before enacting the Civil Aeronautics Act of 1938, "considered *and rejected*" (emphasis in original) an alternative bill that would have granted the CAB authority "to supervise, regulate and control the financial structure" of air carriers. H.R. 5174, 74th Cong., 1st Sess.

§ 305(1) (1935).[9] This bill also would have given the Board authority over the securities of air carriers, §§ 305(2)–(10). The enacted bill, however, contained specific authority to do neither. The Board for a number of years sought authority from Congress "over the security issues and capital structures of air carriers," *see, e. g.*, 1953 CAB Annual Report 40. United further notes that the Air Mail Act of 1934, which preceded the Civil Aeronautics Act, expressly prohibited holding companies from controlling air carriers with air mail contracts. Pub.L. No. 73–308, § 7(b), 48 Stat. 936. The failure to carry this prohibition forward into the 1938 Act, it argues, indicates an affirmative intent that the power to regulate the control of air carriers by holding companies be withheld from the Board. The Federal Aviation Act of 1958 reenacted all of the relevant portions of the 1938 Act without material change. Pub.L. 85–726, 72 Stat. 731 (Aug. 23, 1958).

We do not find this history persuasive that the specific statutory powers conferred upon the Board are insufficient authority to regulate activities of air carriers controlled by diversified holding companies that the Board reasonably finds might interfere with the "sound economic conditions[ ]" of the carriers. What is involved in this case is neither an attempt by the Board to *prohibit* holding companies from acquiring air carriers nor an attempt to "control the financial structure" of air carriers. Rather, the Board is seeking to regulate financial activities by air carriers that may affect the ability of the carriers efficiently to serve the public convenience and necessity. This is one of the most basic powers of the Board. The powers provided in the sections of the Act outlined above, at a minimum, enable the Board to issue regulations restraining the carriers and controlling affiliates from engaging in practices destructive of the air carriers' economic health. The measures suggested by bills introduced in the Congress in the 1930's and

---

**9.** That the specific powers were "rejected" is claimed to be supported by the statement that the "bill . . . never passed." United Brief, p. 21. The claim of rejection is an overstatement from such fact. *See* 79 Cong.Rec. 3156, Index, 804 (1935).

thereafter are insufficiently related to the powers the Board has sought to exercise in this case to convince us that Congress intended to limit the Board's broad powers otherwise inferable from the Act as a whole.[10] The Act that was eventually passed, as noted above, dealt with the economic regulation of air carriers by more general grants of power. The fact that the final statute did not deal specifically with certain matters furnishes no reason that more general provisions should not be given their normal meaning.

Petitioners further argue that whatever may be the Board's power to control the activities of diversified air carriers by the promulgation of regulations, the Board is without power to accomplish this end by amending their certificates under section 401[11] to impose restrictions unrelated to operating conditions.[12] This argument relies not upon any specific prohibition of the Act but upon petitioners' reading of the general intent of sections 401(e)(1) and (g). The latter section lends little support to their position. It broadly enables the Board, on its own initiative, to amend a certificate if "the public convenience and necessity so require." Section 102(b)

defines the "public convenience and necessity" to include the public interest in "sound economic conditions" in the air carrier industry. These sections may be read together to determine the Board's powers under *Midwest Video, American Trucking* and *Deutsche Lufthansa, supra.*

Section 401(e)(1) also fails to support petitioners' contention. That section provides:

Each certificate issued under this section shall specify the terminal points and intermediate points, if any, between which the air carrier is authorized to engage in air transportation and the service to be rendered; and there shall be attached to the exercise of the privileges granted by the certificate, or amendment thereto, such reasonable terms, and conditions, and limitations as the public interest may require.

The opening language of section 401(e)(1) deals with operational matters and thereby lends some credence to petitioners' position. The latter part of the section, however, in language similar to that in section 401(g), enables the Board to attach to *operating certificates* "such reasonable terms and conditions, and limitations as the *public inter-*

10. This court's decision in *Alaska Airlines v. CAB*, 103 U.S.App.D.C. 225, 257 F.2d 229, *cert. denied*, 358 U.S. 881, 79 S.Ct. 120, 3 L.Ed.2d 111 (1958), is not inconsistent with this result. In *Alaska Airlines*, we held that the lack of express authorization in the Civil Aeronautics Act enabling the Board to regulate air carriers' depreciation practices was fatal to its attempt to exercise such power. However, there we relied upon the action of a congressional conference committee which deleted from the Senate bill a provision that expressly would have permitted the CAB to regulate rates of depreciation of air carriers. While the petitioners have striven mightily to fit the legislative history in the present case into the mold of *Alaska Airlines*, they have cited no rejected provision in the legislative history of the statutes here relevant as specific as that upon which the court relied in that case. We therefore do not find it to be a controlling precedent here.

11. The Board notes that action under section 401 may be preferable to approval under section 408 since the latter, by the terms of section 414, 49 U.S.C. § 1384, immunizes from antitrust liability any conduct so approved. *See Hughes Tool Co. v. Trans World Airlines*, 409 U.S. 363, 386, 93 S.Ct. 647, 34 L.Ed.2d 577

(1973). We see nothing improper about this motivation, and petitioners do not contend otherwise.

12. Each of the petitioners also argues that the Board failed to afford it the "notice" required by both section 401(g) and the Administrative Procedure Act, 5 U.S.C. § 554 (1970), and that the Board intended to amend their certificates as a result of the *Investigation*. However, the Board's Order 72–3–27 (March 10, 1972), J.App. 16, which instituted the *Investigation*, stated that an issue would be "what terms, conditions, and limitations on the relationships between air carrier holding companies can and should the Board impose pursuant to its authority under, for instance, sections 401(g) and 408(b) of the Act?" *Id.* at 4, J.App. 16. It also cited section 401 as one of the sections under which the *Investigation* was instituted. *Id.* at 6, J.App. 18. In addition, the record reveals that the matter of this remedy was fully briefed and argued by United. We conclude that the petitioners received sufficient notice that their certificates might be amended at the close of the *Investigation* to satisfy the statutory requirements.

*est* may require." (Emphasis added). This language again is quite broad, and the inclusion of the "public interest" standard dovetails into the policy considerations set out in section 102(b) which extend beyond the physical regulation of air carrier operations and require that the Board, "[i]n the exercise and performance of its powers and duties under this [Act], . . . *shall* consider . . . [t]he regulation of air transportation in such manner as to . . foster sound *economic* conditions in[ ] such transportation . . . ." (Emphasis added). Moreover, the Board has in the past imposed analogous conditions in temporary certificates, *Indiana-Ohio Local Service Case*, 16 C.A.B. 880 (1953), and in the certificates of unscheduled carriers, *Large Irregular Carrier Investigation*, 28 C.A.B. 224 (1959). While these decisions are not direct authority for the present exercise by the CAB, they do suggest that the Board has consistently construed the Act as authorizing such power, a fact of some importance. In summary, while the Act unquestionably places limits on the power that may be exercised by the Board, the broad language of section 401 permitting the Board to place conditions in certificates as the "public interest" or "public convenience and necessity" may require does not support petitioners' narrow interpretation.[13]

Petitioners also argue that section 401 expressly or by implication protects carrier management discretion from impairment by certificate amendment. Section 401(e)(4) does limit Board infringement of management decisions, but only in a relatively narrow area not relevant to the present case:

No term, condition, or limitation of a certificate shall *restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized trans-*portation and service as the development of the business and the demands of the public shall require . . . . .

This section does not purport to limit the CAB's control over "business decisions" of carrier or affiliate management in areas not enumerated, and which might directly affect the financial soundness of the carrier. Nor does it negate or limit the power and obligation of the Board to "foster sound economic conditions." It is therefore of little help to petitioners. Nor do we think that the provision of section 401(n)(4) that supplemental carriers must be and remain "fit, willing and able to perform" negates the Board's power under the Act to impose conditions in the certificates of scheduled carriers designed to ensure their continued financial soundness.

The foregoing sets forth our present views on the issues discussed, insofar as they are presented by the petitioners in the context of the particular factual context here present which only involves three air carriers. We have not discussed the issues more fully because of the disposition we make of the remaining issues, because the eventual action of the Commission in regulating the conduct here involved may reach more carriers and cast the issues here discussed in a more complex form that will alter or affect their ultimate disposition, and because the Board may decide eventually not to impose its conditions on operating certificates but to choose general or special rules to accomplish its objectives with a large number of air carriers. For such reasons we do not finally resolve the bounds of the Board's authority to regulate the financial management of air carriers and their affiliates, whether by general rules, special rules or amendment of certificates. Nor need we consider the propriety of specific provisions of the Board's regulatory scheme.

13. In *Western Air Lines v. CAB*, 161 U.S.App. D.C. 319, 330, 495 F.2d 145, 156 (1969), we stated that under section 401 "[t]he Board was given the power to respond to changed economic conditions and redefinitions of the 'public convenience and necessity' by adjusting the *operating authority* of carriers." (Emphasis added). A material change in corporate structure could furnish an equivalent basis for adjusting the terms and conditions of the operating authority. Only operating authority was at issue in *Western Air Lines*, and we do not regard the quoted language as limiting the Board's power to establish conditions in certificates under section 401 *not directly related to* operating authority.

## IV.

More serious questions are posed by the small numbers of carriers upon which the Board elected to impose restrictions as a result of the *Investigation*. The proceeding was initially constituted essentially as an adjudication, and its scope was restricted to carrier-formed holding companies. Despite a footnote in the initial order suggesting that the Board would welcome intervention by other carriers and therefore some broadening of the *Investigation's* scope, it resolutely adhered to its original limited formulation. The Board declined to follow recommendations by the Departments of Transportation and Justice, its own BOR, United and the ALJ that the proceeding be expanded to involve air carriers that had by other means become a part of other diversified corporate groups. Its final order, amending the petitioners' certificates to impose strict controls on dividends, tax allocation agreements and other intercorporate transactions, therefore applies only to the three air carriers that have created holding companies, and their affiliates. The regulatory plan does not apply to air carriers now controlled by outside "conglomerate" corporations or holding companies, or to air carriers that have themselves become the parents of subsidiaries. The petitioners contend that whether or not the Board has the power to apply such restrictions in the abstract, its decision to limit the remedy only to air carriers that had formed holding companies was improper.

■ Although an agency in its sound discretion may generally elect to proceed either by adjudication or by rulemaking, *SEC v. Chenery Corp.*, 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), its actions must in any event satisfy the applicable standards of review and other statutory requirements. Petitioners evidence some confusion over the standards of review applicable in this case. The Board, however, concedes that under the Act, its factual findings in support of its order must be supported by "substantial evidence." Section 1006(e), 49 U.S.C. § 1486(e).[14] " 'Substantial evidence' is the requirement, no matter what the issue, and no matter how esoteric are the facts to be considered in support of the CAB decision on the issue." *Pillai v. CAB*, 158 U.S.App.D.C. 239, 244, 485 F.2d 1018, 1023 (1973).[15] But our inquiry does not end with a review of the Board's factual findings. The Board's conclusions drawn from the facts are subject to reversal if "they are seen to be arbitrary or capricious, or to rest upon premises that are deemed contrary to ascertainable legislative intent, or are otherwise contrary to law." *Western Air Lines v. CAB*, 161 U.S.App. D.C. 319, 326, 495 F.2d 145, 152 (1974).

Initially, petitioners contend that the Board's orders cannot stand because there was insufficient evidence that these particular petitioners had actually engaged in acts that have had an adverse effect upon their financial health. The ALJ did find that UAL and Tiger International had abused their reorganized forms in minor ways, Initial Decision 139–41 & App. D., J.App. 306–08 & 389–407, and the Board took note of these findings.[16] However,

14. The CAB is required to make express factual findings in support of each of its orders by section 1005(f), 49 U.S.C. § 1485(f) (1970).

15. Section 1006(e) on its face draws no distinction between Board orders entered after a full hearing and those entered after less formal proceedings, and this court in *Pillai* did not appear to recognize such a distinction in determining whether the "substantial evidence" standard of review applies to factual findings supporting CAB orders. The Ninth Circuit, however, recently elected to read section 1006(e) by analogy to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1970), to provide that an order of the CAB entered without a full hearing is subject only to the "arbitrary, capricious, [or] an abuse of discretion" standard of review. *Tiger International, Inc. v. CAB*, 554 F.2d 926, 936 (9th Cir. 1977). Since the full evidentiary hearing was held in the present case, we need not address what the Ninth Circuit suggests is a conflict between the circuits. It is clear that the "substantial evidence" standard of section 1006(e) applies to the Board's factual findings in the present case.

16. Braniff International accurately points out that there were no findings of any misconduct by it. However, the Braniff reorganization was the most recent of the three and was conditionally approved only during the *Investigation*. *See* note 6 *supra*.

neither the ALJ nor the Board based its decision upon these findings in substantial measure. Rather, the Board and the ALJ observed that control of the air carriers by the holding companies had been in effect only for a short time. Reliance was placed principally upon studies of the effects of "diversification" in other industries, in particular ICC studies of rail carriers. *Id.* at 141–42, J.App. 308–09; Orders 75–10–65 & 75–10–66, *supra* at 14–21, J.App. 51–58. These studies, they determine, revealed "potential dangers" from holding company control sufficient to warrant preventive action by the Board.

Well-founded fears by regulatory agencies of such "potential dangers" are in general sufficient to support their action. *See, e. g., GTE Service Corp. v. FCC, supra,* 474 F.2d at 731; *Mt. Mansfield Television, Inc. v. FCC,* 442 F.2d 470, 487 (2d Cir. 1971). We conclude that nothing in the Federal Aviation Act, including the "substantial evidence" standard of review for CAB factual findings, requires a different result. The Board is not required to wait for the horse to be stolen before closing the barn door.

█ In the present case, the Board's rational conclusion that the acquisition of control of air carriers by holding companies presents a substantial danger of harm to the carriers' ability to serve the public convenience and necessity forms a sufficient basis for the Board to take preventive measures. The evils of holding company control of corporations in the United States have been documented in a number of industries. Nothing in the structure of the airline industry would indicate that airline carriers are immune from such consequences.

Nevertheless, the Board must justify its distinction between the class of carriers to which it has applied these restrictions and those to which it has not. The Board's burden necessarily increases as the effect upon the regulated class becomes more severe, *vis-a-vis* others not so regulated. *Cf. Braniff Airways v. CAB,* 113 U.S.App.D.C. 132, 306 F.2d 739 (1962). In the present case, the Board's application of restrictions only to the three petitioners is neither rational nor based upon factual findings supported by substantial evidence.

The Board, in its consolidated Orders 75–10–65 & 75–10–66, *supra,* directed most of its attention to "The Effects of Diversification" in general, *id.* at 14–21, J.App. 51–58. However, it also identified "three primary grounds" for applying its innovative regulatory program only to the three air carriers that transferred control to carrier-created holding companies. *Id.* at 13–14, J.App. 50–51. First, the Board noted that in a carrier-formed holding company organization, management decisions are shifted to the holding company management from that of the air carrier, accounting procedures based on the holding company obscure the financial condition of the air carrier, and the relative importance of the air carrier to holding company management declines as other holdings increase. Moreover, the assets of the air carrier, which constitute most of the assets of the holding company, are needed to finance continued diversification by the holding company. Second, the Board concluded that the application of the regulatory plan only to those three carriers would "not detrimentally affect their operating authority or competitive position." Third, it stated that the hearing record, which was primarily concerned with carrier-formed holding companies, "justifies the limitation of these regulations to those carriers which have pursued this distinguishable course of diversification." The Board also noted that the scope of its regulatory plan was expansible as experience was gained with the regulation of this limited class.

In its Order 76–1–121, *supra,* denying Braniff's petition for reconsideration on this point, the Board amplified its explanation but did not change its underlying grounds for treating these three carriers differently from all others that are subject to external control. It added only that holding company reorganization generally

places the carrier as a subsidiary corporation under the 100-percent control of a single entity, the holding company, reducing the potential for shareholder derivative suits that exists when an operating corporation is widely held. *Id.* at 6–7, J.App. 137–38.

These purported distinctions between carrier-formed holding companies, air carriers acquired by outside conglomerates, and air carriers that have diversified through the acquisition of subsidiaries, in our view, are simply insufficient to justify the imposition *only* upon carrier-formed holding companies of such a strong remedy. On examination, most of the differences described by the CAB turn out to be illusory, at least insofar as those air carriers are concerned that are controlled by outside conglomerates. The Board's distinctions based on the transfer of management control to the holding company and upon the alteration in accounting procedures apply as well to air carriers acquired by conglomerates as they do to air carrier-created holding companies. The observation that the assets of the air carrier are needed to finance diversification, and are the bulk of the available assets for this purpose, applies equally to air carrier parent corporations as it does to carrier-formed holding companies. That the relative importance of the air carrier to the controlling corporation declines as diversified holdings increase is equally true, if at all, of *all three* forms of organization.

The Board also notes that in the case of a transfer of an air carrier to a conglomerate corporation, it has an opportunity under its section 408(a)(5) jurisdiction to scrutinize the prior management of the conglomerate to ascertain if it will deal fairly with the air carrier subsidiary. However, the Board asserts, and we herein sustain, the same jurisdiction over a transfer to a carrier-created holding company.[17] Moreover, the Board

may examine the past management of the air carrier itself, which will initially be the dominant element in the new holding company, to determine its general level of responsibility and interest in the health of the air carrier.

The Board's conclusion that a holding company formed by an air carrier reduces the likelihood of shareholder derivative suits, unlike the Board's other distinctions, has some logic on its side and is some basis for distinguishing such organizations from the other two forms of organization, since outside conglomerates may not always acquire 100-percent control of subsidiaries. However, derivative suits could still be brought against the holding company attacking their stewardship of the air carrier and other controlled companies. We do not consider that the distinction related to the likelihood of derivative suits alone provides a rational basis for the drastic differences in treatment.

The finding that the imposition of these controls upon *only* the three petitioners will not erode their competitive positions or operating authority appears to lack any substantial evidentiary support in the record. In fact the ALJ, who was much closer to the record than either the Board or this court, not only recommended but also *assumed* that similar controls on all diversified carriers would follow as a matter of course. Finally, the Board's conclusion that the *record* supports the distinction between the petitioners and all other diversified air carriers represents a "Catch-22" for the petitioners, since the Board resolutely resisted all recommendations that the *Investigation* be expanded to create a more complete record. The Board's overriding concern, in limiting both the *Investigation* and the remedy as it did, appears to have been an interest in administrative convenience and

17. United contends that the Board elected to amend the certificates of the three air carrier petitioners in order to "get" United, since the Board had failed to assert section 408(a)(5) jurisdiction over the United reorganization. The Board's decision not to impose conditions on the United reorganization under section 408(a)(5) would not disable the Board from

subsequently imposing similar conditions upon United and UAL as a part of a rational regulatory program. But the Board's failure to assert section 408(a)(5) jurisdiction over the United reorganization of course does not *enhance* the rational basis for such a subsequent regulatory program. Any such program must stand or fall upon its own.

manageability. These are proper criteria as an abstract matter, but do not in themselves provide a rational basis for imposing drastically different treatment upon a narrow class of air carriers.

The Board's findings and conclusions thus do not provide a rational basis for the imposition of restrictions solely on the dividend declarations, tax allocation agreements, and other intercorporate transactions of the three petitioner air carriers and their affiliates.[18]

█ We do not conclude that the Board is without power under the Act, either through general rules, special rules or the amendment of certificates, to require financial management decisions of diversified air carriers that have a potential for adversely affecting the air carriers' ability to satisfy the public convenience and necessity. Nor do we hold that the imposition of such regulations may only be accomplished after proof of actual injury to the particular air carrier. Rather, we simply hold that the Board's decision to regulate the corporate activities of this limited class of air carriers, represented by the three petitioners in this review, was arbitrary and capricious and without a rational basis. Because of this conclusion, we need not determine whether every aspect of the scheme of regulation rested upon a rational basis.

*Vacated and Remanded.*

McGOWAN, Circuit Judge, concurring, in which BAZELON, Chief Judge, joins:

█ I concur in Judge MacKINNON's thorough and perceptive opinion; and add this brief statement only to express my understanding of what has been conclusively determined by it. Because the Civil Aer-

onautics Board irrationally limited its diversification inquiry and resulting regulatory measures to the three petitioner airlines, it must, if it persists in this regulatory objective, initiate a new proceeding that provides for the participation by, and the consideration of, all air carriers who have achieved diversification by any means or may have an interest in doing so in the future. It is my understanding that in the new proceeding the issue of the existence, source, and scope of the Board's authority to impose a regulatory program of the kind here involved continues to remain open.

As Judge MacKINNON's decision makes clear, on the record before us we do not find petitioners' arguments that the Board exceeded its statutory authority so persuasive as to warrant our disposition of these appeals on that ground, as petitioners would have us do. Nonetheless, because the authority issue is not wholly free from doubt in at least some of its aspects, and because we must in any case vacate and remand the Board's decision for further proceedings, it seems appropriate to allow those proceedings, enlarged as they will be by new parties who have not as yet been heard on this score, to shed additional light on the subject before we finally decide it, if we are called upon·to do so.

---

18. This conclusion is supported by analogy to section 416(a) of the Act, 49 U.S.C. § 1386(a), which provides that:

> The Board may from time to time establish such just and reasonable classifications or groups of air carriers for the purposes of this subchapter as the nature of the services performed by such air carriers shall require; and such just and reasonable rules and regulations, pursuant to and consistent with the provisions of this subchapter, to be observed

by each such class or group, as the Board finds necessary in the public interest.

We disagree with petitioners' argument that a negative implication from this section bars the Board from drawing any regulatory distinctions between air carriers not related to the "nature of the services performed" by the carriers. *Cf.* text at notes 9–11 *supra*. However, its provision that "classifications" made by the CAB must be "reasonable" is in accord with our analysis and supports our result by analogy.